## WOLMAN ET AL. *v.* WALTER ET AL.

No. 76–496.   Argued April 25, 1977—Decided June 24, 1977

230

BLACKMUN, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, V, VI, VII, and VIII, in which STEWART and STEVENS, JJ., joined; in which as to Part I, BURGER, C. J., and BRENNAN, MARSHALL, and POWELL, JJ., also joined; in which as to Part V, BURGER, C. J., and MARSHALL and POWELL, JJ., also joined; in which as to Part VI, BURGER, C. J., and POWELL, J., also joined; in which as to Parts VII and VIII, BRENNAN and MARSHALL, JJ., also joined; and an opinion with respect to Parts II, III, and IV, in which BURGER, C. J., and STEWART and POWELL, JJ., joined. BURGER, C. J., dissented in part. BRENNAN, J., *post*, p. 255, MARSHALL, J., *post*, p. 256, and STEVENS, J.,

*post*, p. 264, filed opinions concurring in part and dissenting in part. POWELL, J., filed an opinion concurring in part, concurring in the judgment in part, and dissenting in part, *post*, p. 262. WHITE and REHNQUIST, JJ., filed a statement concurring in the judgment in part and dissenting in part, *post*, p. 255.

*Joshua J. Kancelbaum* argued the cause for appellants. With him on the briefs were *Nelson G. Karl, Donald M. Robiner,* and *Joel M. Gora.*

*Thomas V. Martin,* Assistant Attorney General of Ohio, argued the cause for the state appellees. With him on the brief were *William J. Brown,* Attorney General, and *Lawrence H. Braun. David J. Young* argued the cause for appellees Grit et al. With him on the brief was *David P. Hiller.**

MR. JUSTICE BLACKMUN delivered the opinion of the Court (Parts I, V, VI, VII, and VIII), together with an opinion (Parts II, III, and IV), in which THE CHIEF JUSTICE, MR. JUSTICE STEWART, and MR. JUSTICE POWELL joined.

This is still another case presenting the recurrent issue of the limitations imposed by the Establishment Clause of the First Amendment, made applicable to the States by the Fourteenth Amendment, *Meek* v. *Pittenger,* 421 U. S. 349, 351 (1975), on state aid to pupils in church-related elementary and secondary schools. Appellants are citizens and taxpayers of Ohio. They challenge all but one of the provisions of Ohio

---

*Briefs of *amici curiae* urging reversal were filed by *Melvin L. Wulf, Arnold Forster,* and *Meyer Eisenberg* for the Anti-Defamation League of B'Nai B'rith; and by *Leo Pfeffer* for the National Coalition for Public Education and Religious Liberty.

*Thomas A. Quintrell* and *Thomas V. Chema* filed a brief for 21 Ohio Independent Schools as *amici curiae* urging affirmance.

*Solicitor General McCree* filed a memorandum for the United States as *amicus curiae.* Briefs of *amici curiae* were filed by *W. Bernard Richland* for the city of New York; and by *Leonard J. Schwartz, Andrew M. Fishman,* and *Philip Dunson* for the State Convention of Baptists in Ohio et al.

Rev. Code Ann. § 3317.06 (Supp. 1976) which authorize various forms of aid. The appellees are the State Superintendent of Public Instruction, the State Treasurer, the State Auditor, the Board of Education of the City School District of Columbus, Ohio, and, at their request, certain representative potential beneficiaries of the statutory program. A three-judge court was convened. It held the statute constitutional in all respects. *Wolman* v. *Essex*, 417 F. Supp. 1113 (ND Ohio 1976). We noted probable jurisdiction. 429 U. S. 1037 (1977).

## I

Section 3317.06 was enacted after this Court's May 1975 decision in *Meek* v. *Pittenger, supra,* and obviously is an attempt to conform to the teachings of that decision.[1] The state appellees so acknowledged at oral argument. Tr. of Oral Arg. 21. In broad outline, the statute authorizes the State to provide nonpublic school pupils with books, instructional materials and equipment, standardized testing and scoring, diagnostic services, therapeutic services, and field trip transportation.

The initial biennial appropriation by the Ohio Legislature for implementation of the statute was the sum of $88,800,000.[2]

---

[1] At the time *Meek* was decided, an appeal was pending before us from a District Court judgment holding constitutional the predecessor Ohio statute providing for aid to nonpublic schools. *Wolman* v. *Essex*, No. 73–292 (SD Ohio, July 1, 1974). This Court vacated that judgment and remanded the case for further consideration in light of *Meek*. 421 U. S. 982 (1975).

On remand, the District Court entered a consent order, dated November 17, 1975, declaring the predecessor statute, which by then had been repealed, violative of the First and Fourteenth Amendments, but reserving decision on the constitutionality of the successor legislation. Appellants, who were plaintiffs in the original suit, then shifted their challenge to the present, successor statute.

[2] On December 10, 1975, a single judge of the District Court entered a temporary restraining order enjoining the defendants from expending any

App. 27.  Funds so appropriated are paid to the State's public school districts and are then expended by them.  All disbursements made with respect to nonpublic schools have their equivalents in disbursements for public schools, and the amount expended per pupil in nonpublic schools may not exceed the amount expended per pupil in the public schools.

The parties stipulated that during the 1974–1975 school year there were 720 chartered nonpublic schools in Ohio.  Of these, all but 29 were sectarian.  More than 96% of the nonpublic enrollment attended sectarian schools, and more than 92% attended Catholic schools.  *Id.*, at 28–29.  It was also stipulated that, if they were called, officials of representative Catholic schools would testify that such schools operate under the general supervision of the bishop of their diocese; that most principals are members of a religious order within the Catholic Church; that a little less than one-third of the teachers are members of such religious orders; that "in all probability a majority of the teachers are members of the Catholic faith"; and that many of the rooms and hallways in these schools are decorated with a Christian symbol.  *Id.*, at 30–33.  All such schools teach the secular subjects required to meet the State's minimum standards.  The state-mandated five-hour day is expanded to include, usually, one-half hour of religious instruction.  Pupils who are not members of the Catholic faith are not required to attend religion classes or to participate in religious exercises or activities, and no teacher is required to teach religious doctrine as a part of the secular courses taught in the schools.  *Ibid.*

The parties also stipulated that nonpublic school officials, if called, would testify that none of the schools covered by the statute discriminate in the admission of pupils or in the hiring

funds or otherwise implementing any aspect of § 3317.06.  Record, Doc. 10. On February 13, 1976, by consent of the parties, the three-judge court modified the restraining order to permit the defendants to expend funds necessary to purchase textbooks and lend them to pupils or their parents pursuant to § 3317.06 (A).  Record, Doc. 18.

of teachers on the basis of race, creed, color, or national origin. *Id.*, at 29.[3]

The District Court concluded:

> "Although the stipulations of the parties evidence several significant points of distinction, the character of these schools is substantially comparable to that of the schools involved in *Lemon* v. *Kurtzman,* 403 U. S. 602, 615–618 . . . (1971)." 417 F. Supp., at 1116.[4]

## II

The mode of analysis for Establishment Clause questions is defined by the three-part test that has emerged from the

---

[3] We take this to be a reading of the command of § 3317.06 which, in somewhat less clear form, provides:

"Health and remedial services and instructional materials and equipment provided for the benefit of nonpublic school pupils pursuant to this section and the admission of pupils to such nonpublic schools shall be provided without distinction as to race, creed, color, or national origin of such pupils or of their teachers."

See also 417 F. Supp. 1113, 1116.

[4] The state appellees do not argue in this case that any differences between the schools involved here and those in *Lemon* are significant. The private appellees state that "the heretofore presumed differences between elementary, secondary and higher education may need reconsideration," Brief for Appellees Grit et al. 13, but do not point out in what way any differences might be relevant. They argue instead:

"However, since church-related schools in Ohio have a religious mission and intend to retain it, we urge that the constitutionality of the Ohio program be upheld because it provides secular, neutral and nonideological assistance rather than because the schools do not fit a standard religious profile." *Id.*, at 13–14.

The institutions aided under the Ohio statute are elementary and secondary schools. The Court said in *Lemon:*

"This process of inculcating religious doctrine is, of course, enhanced by the impressionable age of the pupils, in primary schools particularly." 403 U. S., at 616.

See also *Tilton* v. *Richardson,* 403 U. S. 672, 684–689 (plurality opinion); *Roemer* v. *Maryland Public Works Bd.,* 426 U. S. 736, 764–765 (1976).

Court's decisions. In order to pass muster, a statute must have a secular legislative purpose, must have a principal or primary effect that neither advances nor inhibits religion, and must not foster an excessive government entanglement with religion. See *Roemer* v. *Maryland Public Works Bd.*, 426 U. S. 736, 748 (1976); *Committee for Public Education* v. *Nyquist*, 413 U. S. 756, 772–773 (1973); *Lemon* v. *Kurtzman*, 403 U. S. 602, 612, 613 (1971).

. In the present case we have no difficulty with the first prong of this three-part test. We are satisfied that the challenged statute reflects Ohio's legitimate interest in protecting the health of its youth and in providing a fertile educational environment for all the schoolchildren of the State.[5] As is usual in our cases, the analytical difficulty has to do with the effect and entanglement criteria.

We have acknowledged before, and we do so again here, that the wall of separation that must be maintained between church and state "is a blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship." *Lemon,* 403 U. S., at 614. Nonetheless, the Court's numerous precedents "have become firmly rooted," *Nyquist,* 413 U. S., at 761, and now provide substantial guidance. We therefore turn to the task of applying the rules derived from our decisions to the respective provisions of the statute at issue.

### III

### Textbooks

Section 3317.06 authorizes the expenditure of funds:

"(A) To purchase such secular textbooks as have been approved by the superintendent of public instruction for

---

[5] Section 3317.06 explicitly provides:

"No school district shall provide services, materials, or equipment for use in religious courses, devotional exercises, religious training, or any other religious activity."

use in public schools in the state and to loan such textbooks to pupils attending nonpublic schools within the district or to their parents. Such loans shall be based upon individual requests submitted by such nonpublic school pupils or parents. Such requests shall be submitted to the local public school district in which the nonpublic school is located. Such individual requests for the loan of textbooks shall, for administrative convenience, be submitted by the nonpublic school pupil or his parent to the nonpublic school which shall prepare and submit collective summaries of the individual requests to the local public school district. As used in this section, 'textbook' means any book or book substitute which a pupil uses as a text or text substitute in a particular class or program in the school he regularly attends."

The parties' stipulations reflect operation of the textbook program in accord with the dictates of the statute. In addition, it was stipulated:

"The secular textbooks used in nonpublic schools will be the same as the textbooks used in the public schools of the state. Common suppliers will be used to supply books to both public and nonpublic school pupils." App. 35.

"Textbooks, including book substitutes, provided under this Act shall be limited to books, reusable workbooks, or manuals, whether bound or in looseleaf form, intended for use as a principal source of study material for a given class or group of students, a copy of which is expected to be available for the individual use of each pupil in such class or group." *Id.,* at 36.

This system for the loan of textbooks to individual students bears a striking resemblance to the systems approved in *Board of Education* v. *Allen,* 392 U. S. 236 (1968), and in

*Meek* v. *Pittenger,* 421 U. S. 349 (1975).[6]  Indeed, the only distinction offered by appellants is that the challenged statute defines "textbook" as "any book or book substitute."  Appellants argue that a "book substitute" might include auxiliary equipment and materials that, they assert, may not constitutionally be loaned.  See Part VII, *infra.*  We find this argument untenable in light of the statute's separate treatment of instructional materials and equipment in its subsections (B) and (C), and in light of the stipulation defining textbooks as "limited to books, reusable workbooks, or manuals."  Appellants claim that the stipulation shows only the intent of the Department of Education, App. 49, and that the statute is so vague as to fail to insure against sectarian abuse of the assistance programs, citing *Meek,* 421 U. S., at 372, and *Lemon,* 403 U. S., at 619.  We find no grounds, however, to doubt the Board of Education's reading of the statute, or to fear that the Board is using the stipulations as a subterfuge.  As read, the statute provides the same protections against abuse as were provided in the textbook programs under consideration in *Allen* and in *Meek.*

In the alternative, appellants urge that we overrule *Allen* and *Meek.*  This we decline to do.  Accordingly, we conclude that § 3317.06 (A) is constitutional.

## IV

### Testing and Scoring

Section 3317.06 authorizes expenditure of funds:

> "(J) To supply for use by pupils attending nonpublic schools within the district such standardized tests and

---

[6] As was the case in *Meek,* the Ohio Code provides in separate sections for the loan of textbooks to public school children and to nonpublic school children.  The former is covered by Ohio Rev. Code Ann. § 3329.06 (1972).  The Court observed in *Meek:* "So long as the textbook loan program includes all schoolchildren, those in public as well as those in private schools, it is of no constitutional significance whether the general program is codified in one statute or two."  421 U. S., at 360 n. 8.

scoring services as are in use in the public schools of the state."

These tests "are used to measure the progress of students in secular subjects." App. 48. Nonpublic school personnel are not involved in either the drafting or scoring of the tests. 417 F. Supp., at 1124. The statute does not authorize any payment to nonpublic school personnel for the costs of administering the tests.[7]

In *Levitt* v. *Committee for Public Education,* 413 U. S. 472 (1973), this Court invalidated a New York statutory scheme for reimbursement of church-sponsored schools for the expenses of teacher-prepared testing. The reasoning behind that decision was straightforward. The system was held unconstitutional because "no means are available, to assure that internally prepared tests are free of religious instruction."[8] *Id.,* at 480.

---

[7] With respect to the tests the state appellees say:

"No financial aid is involved in Ohio. The tests themselves are provided." Brief for State Appellees 8.

As summarized by the private appellees:

"The new Ohio Act has nothing to do with teacher-prepared tests. It does not reimburse schools for costs incurred in testing. No money flows to the nonpublic school or parent. It simply permits the local public school districts to send the standardized achievement test to the nonpublic schools and to arrange for the grading of those tests by the commercial publishing organizations which prepare and grade standardized achievement tests." Brief for Appellees Grit et al. 53.

Further, the statute approves expenditures only for "such standardized tests and scoring services as are in use in the public schools of the state." We read this to mean that the school districts may not expend more per pupil in providing standardized testing to the nonpublic schools than they expend in providing such testing in the public schools.

[8] "Yet, despite the obviously integral role of such testing in the total teaching process, no attempt is made under the statute, and no means are available, to assure that internally prepared tests are free of religious instruction.

"We cannot ignore the substantial risk that these examinations, pre-

There is no question that the State has a substantial and legitimate interest in insuring that its youth receive an adequate secular education. *Id.,* at 479–480, n. 7. The State may require that schools that are utilized to fulfill the State's compulsory-education requirement meet certain standards of instruction, *Allen,* 392 U. S., at 245, 246, and n. 7, and may examine both teachers and pupils to ensure that the State's legitimate interest is being fulfilled. *Levitt,* 413 U. S., at 479–480, n. 7; *Lemon,* 403 U. S., at 614. See App. 28. Cf. *Pierce* v. *Society of Sisters,* 268 U. S. 510, 534 (1925). Under the section at issue, the State provides both the schools and the school district with the means of ensuring that the minimum standards are met. The nonpublic school does not control the content of the test or its result. This serves to prevent the use of the test as a part of religious teaching, and thus avoids that kind of direct aid to religion found present in *Levitt.* Similarly, the inability of the school to control the test eliminates the need for the supervision that gives rise to

---

pared by teachers under the authority of religious institutions, will be drafted with an eye, unconsciously or otherwise, to inculcate students in the religious precepts of the sponsoring church. We do not 'assume that teachers in parochial schools will be guilty of bad faith or any conscious design to evade the limitations imposed by the statute and the First Amendment.' *Lemon* v. *Kurtzman,* 403 U. S., at 618. But the potential for conflict 'inheres in the situation,' and because of that the State is constitutionally compelled to assure that the state-supported activity is not being used for religious indoctrination. See *id.,* at 617, 619. Since the State has failed to do so here, we are left with no choice under *Nyquist* but to hold that Chapter 138 constitutes an impermissible aid to religion; this is so because the aid that will be devoted to secular functions is not identifiable and separable from aid to sectarian activities." *Levitt,* 413 U. S., at 480.

The New York system at issue in *Levitt* provided funding for both teacher-prepared and standardized testing. The Court did not reach any issue regarding the standardized testing, for it found its funding inseparable from the unconstitutional funding of teacher-prepared testing. *Id.,* at 481.

excessive entanglement. We therefore agree with the District Court's conclusion that § 3317.06 (J) is constitutional.

## V

### Diagnostic Services

Section 3317.06 authorizes expenditures of funds:

"(D) To provide speech and hearing diagnostic services to pupils attending nonpublic schools within the district. Such service shall be provided in the nonpublic school attended by the pupil receiving the service.

.　　　.　　　.　　　.　　　.

"(F) To provide diagnostic psychological services to pupils attending nonpublic schools within the district. Such services shall be provided in the school attended by the pupil receiving the service." [9]

It will be observed that these speech and hearing and psychological diagnostic services are to be provided within the nonpublic school. It is stipulated, however, that the personnel (with the exception of physicians) who perform the services are employees of the local board of education; that physicians may be hired on a contract basis; that the purpose of these services is to determine the pupil's deficiency or need of assistance; and that treatment of any defect so found would take place off the nonpublic school premises. App. 37–38. See Part VI, *infra*.

Appellants assert that the funding of these services is constitutionally impermissible. They argue that the speech and

_____

[9] Section 3317.06 also provides:

"No school district shall provide health or remedial services to nonpublic school pupils as authorized by this section unless such services are available to pupils attending the public schools within the district."

We understand this restriction to impose a quantitative as well as a qualitative limit on the aid to nonpublic schools for health and remedial services.

hearing staff might engage in unrestricted conversation with the pupil and, on occasion, might fail to separate religious instruction from secular responsibilities. They further assert that the communication between the psychological diagnostician and the pupil will provide an impermissible opportunity for the intrusion of religious influence.

The District Court found these dangers so insubstantial as not to render the statute unconstitutional. 417 F. Supp., at 1121–1122. We agree. This Court's decisions contain a common thread to the effect that the provision of health services to all schoolchildren—public and nonpublic—does not have the primary effect of aiding religion. In *Lemon* v. *Kurtzman,* the Court stated:

> "Our decisions from *Everson* [v. *Board of Education,* 330 U. S. 1 (1947),] to *Allen* have permitted the States to provide church-related schools with secular, neutral, or nonideological services, facilities, or materials. Bus transportation, school lunches, *public health services,* and secular textbooks supplied in common to all students were not thought to offend the Establishment Clause." 403 U. S., at 616–617 (emphasis added).

See also *Meek* v. *Pittenger,* 421 U. S., at 364, 368 n. 17. Indeed, appellants recognize this fact in not challenging subsection (E) of the statute that authorizes publicly funded physician, nursing, dental, and optometric services in nonpublic schools.[10] We perceive no basis for drawing a different conclusion with respect to diagnostic speech and hearing services and diagnostic psychological services.

In *Meek* the Court did hold unconstitutional a portion of a Pennsylvania statute at issue there that authorized certain

---

[10] Section 3317.06 authorizes the local school district to expend funds:

"(E) To provide physician, nursing, dental, and optometric services to pupils attending nonpublic schools within the district. Such services shall be provided in the school attended by the nonpublic school pupil receiving the service."

auxiliary services—"remedial and accelerated instruction, guidance counseling and testing, speech and hearing services"—on nonpublic school premises. *Id.*, at 367. The Court noted that the teacher or guidance counselor might "fail on occasion to separate religious instruction and the advancement of religious beliefs from his secular educational responsibilities." *Id.*, at 371. The Court was of the view that the publicly employed teacher or guidance counselor might depart from religious neutrality because he was "performing important educational services in schools in which education is an integral part of the dominant sectarian mission and in which an atmosphere dedicated to the advancement of religious belief is constantly maintained." *Ibid.* The statute was held unconstitutional on entanglement grounds, namely, that in order to insure that the auxiliary teachers and guidance counselors remained neutral, the State would have to engage in continuing surveillance on the school premises.[11] *Id.*, at 372. See also *Public Funds for Public Schools* v. *Marburger,* 358 F. Supp. 29, 40 (NJ 1973), summarily aff'd, 417 U. S. 961 (1974). The Court in *Meek* explicitly stated, however, that the provision of diagnostic speech and hearing services by Pennsylvania seemed "to fall within that class of general welfare services for children that may be provided by the State regardless of the incidental benefit that accrues to church-related schools."

---

[11] The Court also mentioned that the auxiliary-services program had a serious potential for generating divisive and continuing political conflict over the issue of aid to religion. 421 U. S., at 372. The Ohio diagnostic-services program, in contrast, is unlikely to have a similar effect. First, as is discussed in the text, the Ohio program is quite unlike *Meek's* auxiliary-services program in that it is not so susceptible to the intrusion of sectarian overtones. Since it is not likely to be seen as involving aid to religion, any controversy it provokes will not focus on religion. In fact, it is hard to believe that religious controversy would be generated by the offer of uniform health services for all schoolchildren. Second, the diagnostic-services program is much more modest than the *Meek* program. Its potential for arousing political controversy is thus correspondingly reduced.

421 U. S., at 371 n. 21. The provision of such services was invalidated only because it was found unseverable from the unconstitutional portions of the statute. *Ibid.*

The reason for considering diagnostic services to be different from teaching or counseling is readily apparent. First, diagnostic services, unlike teaching or counseling, have little or no educational content and are not closely associated with the educational mission of the nonpublic school. Accordingly, any pressure on the public diagnostician to allow the intrusion of sectarian views is greatly reduced. Second, the diagnostician has only limited contact with the child, and that contact involves chiefly the use of objective and professional testing methods to detect students in need of treatment. The nature of the relationship between the diagnostician and the pupil does not provide the same opportunity for the transmission of sectarian views as attends the relationship between teacher and student or that between counselor and student.

We conclude that providing diagnostic services on the nonpublic school premises will not create an impermissible risk of the fostering of ideological views. It follows that there is no need for excessive surveillance, and there will not be impermissible entanglement. We therefore hold that §§ 3317.06 (D) and (F) are constitutional.

## VI

### Therapeutic Services

Sections 3317.06 (G), (H), (I), and (K) authorize expenditures of funds for certain therapeutic, guidance, and remedial services for students who have been identified as having a need for specialized attention.[12] Personnel providing the serv-

---

[12] The sections authorize expenditures of funds:

"(G) To provide therapeutic psychological and speech and hearing services to pupils attending nonpublic schools within the district. Such services shall be provided in the public school, in public centers, or in mobile units located off of the nonpublic premises as determined by the

ices must be employees of the local board of education or under contract with the State Department of Health. The services are to be performed only in public schools, in public centers, or in mobile units located off the nonpublic school premises. App. 42. The parties have stipulated: "The determination as to whether these programs would be offered in the public school, public center, or mobile unit will depend on the distance between the public and nonpublic school, the safety factors involved in travel, and the adequacy of accommodations in public schools and public centers." *Ibid.*

---

state department of education. If such services are provided in the public school or in public centers, transportation to and from such facilities shall be provided by the public school district in which the nonpublic school is located.

"(H) To provide guidance and counseling services to pupils attending nonpublic schools within the district. Such services shall be provided in the public school, in public centers, or in mobile units located off of the nonpublic premises as determined by the state department of education. If such services are provided in the public school or in public centers, transportation to and from such facilities shall be provided by the public school district in which the nonpublic school is located.

"(I) To provide remedial services to pupils attending nonpublic schools within the district. Such services shall be provided in the public school, in public centers, or in mobile units located off of the nonpublic premises as determined by the state department of education. If such services are provided in the public school or in public centers, transportation to and from such facilities shall be provided by the public school district in which the nonpublic school is located.

.  .  .  .  .

"(K) To provide programs for the deaf, blind, emotionally disturbed, crippled, and physically handicapped children attending nonpublic schools within the district. Such services shall be provided in the public school, in public centers, or in mobile units located off of the nonpublic premises as determined by the state department of education. If such services are provided in the public school, or in public centers, transportation to and from such facilities shall be provided by the public school district in which the nonpublic school is located."

The services for the public schools must be at least equal to those offered for the nonpublic schools. See n. 9, *supra*.

Appellants concede that the provision of remedial, therapeutic, and guidance services in public schools, public centers, or mobile units is constitutional if both public and nonpublic school students are served simultaneously. Brief for Appellants 41–42, 46.[13] Their challenge is limited to the situation where a facility is used to service only nonpublic school students. They argue that any program that isolates the sectarian pupils is impermissible because the public employee providing the service might tailor his approach to reflect and reinforce the ideological view of the sectarian school attended by the children. Such action by the employee, it is claimed, renders direct aid to the sectarian institution. Appellants express particular concern over mobile units because they perceive a danger that such a unit might operate merely as an annex of the school or schools it services.

At the outset, we note that in its present posture the case does not properly present any issue concerning the use of a public facility as an adjunct of a sectarian educational enterprise. The District Court construed the statute, as do we, to authorize services only on sites that are "neither physically

---

[13] We believe this concession reflects appellants' understanding that the programs are not intended to influence the classroom activities in the nonpublic schools. Our Brother MARSHALL argues that certain stipulations regarding paragraph (H) announce that guidance counseling will include planning and selection of particular courses. *Post*, at 261. We agree that such involvement with the day-to-day curriculum of the parochial school would be impermissible. We, however, do not so read the stipulations. Rather, we understand them to recognize that a guidance counselor will engage in broad-scale, long-term planning of a student's career choices and the general areas of study that will further those choices. Our Brother MARSHALL also argues that the stipulations reflect an understanding that remedial service teachers under paragraph (I) will plan courses of study for use in the classroom. *Ibid.* Such a provision would pose grave constitutional questions. The stipulations, however, provide only that the remedial service teacher will keep the classroom teacher informed of the action taken. App. 49. We do not understand the stipulations to approve planning of classroom activities.

nor educationally identified with the functions of the non-public school." 417 F. Supp., at 1123. Thus, the services are to be offered under circumstances that reflect their religious neutrality.

We recognize that, unlike the diagnostician, the therapist may establish a relationship with the pupil in which there might be opportunities to transmit ideological views. In *Meek* the Court acknowledged the danger that publicly employed personnel who provide services analogous to those at issue here might transmit religious instruction and advance religious beliefs in their activities. But, as discussed in Part V, *supra,* the Court emphasized that this danger arose from the fact that the services were performed in the pervasively sectarian atmosphere of the church-related school. 421 U. S., at 371. See also *Lemon,* 403 U. S., at 618–619. The danger existed there, not because the public employee was likely deliberately to subvert his task to the service of religion, but rather because the pressures of the environment might alter his behavior from its normal course. So long as these types of services are offered at truly religiously neutral locations, the danger perceived in *Meek* does not arise.

The fact that a unit on a neutral site on occasion may serve only sectarian pupils does not provoke the same concerns that troubled the Court in *Meek*.[14] The influence on a therapist's behavior that is exerted by the fact that he serves a sectarian pupil is qualitatively different from the influence of the pervasive atmosphere of a religious institution. The dangers

---

[14] The purpose of the program is to aid schoolchildren, and the use of convenient local centers is a sensible way to implement the program. Although the public schools may often be used, considerations of safety, distance, and the adequacy of accommodations on occasion will justify the use of public centers or mobile units near the nonpublic school premises. *Id.,* at 42. Certainly the Establishment Clause should not be seen as foreclosing a practical response to the logistical difficulties of extending needed and desired aid to all the children of the community.

perceived in *Meek* arose from the nature of the institution, not from the nature of the pupils.

Accordingly, we hold that providing therapeutic and remedial services at a neutral site off the premises of the nonpublic schools will not have the impermissible effect of advancing religion. Neither will there be any excessive entanglement arising from supervision of public employees to insure that they maintain a neutral stance. It can hardly be said that the supervision of public employees performing public functions on public property creates an excessive entanglement between church and state. Sections 3317.06 (G), (H), (I), and (K) are constitutional.

## VII

### Instructional Materials and Equipment

Sections 3317.06 (B) and (C) authorize expenditures of funds for the purchase and loan to pupils or their parents upon individual request of instructional materials and instructional equipment of the kind in use in the public schools within the district and which is "incapable of diversion to religious use." [15] Section 3317.06 also provides that the materials and equipment may be stored on the premises of a nonpublic school and that publicly hired personnel who

---

[15] The sections authorize expenditures of funds:

"(B) To purchase and to loan to pupils attending nonpublic schools within the district or to their parents upon individual request, such secular, neutral and nonideological instructional materials as are in use in the public schools within the district and which are incapable of diversion to religious use and to hire clerical personnel to administer such lending program.

"(C) To purchase and to loan to pupils attending nonpublic schools within the district or to their parents, upon individual request, such secular, neutral and nonideological instructional equipment as is in use in the public school within the district and which is incapable of diversion to religious use and to hire clerical personnel to administer such lending program."

administer the lending program may perform their services upon the nonpublic school premises when necessary "for efficient implementation of the lending program."

Although the exact nature of the material and equipment is not clearly revealed, the parties have stipulated: "It is expected that materials and equipment loaned to pupils or parents under the new law will be similar to such former materials and equipment except that to the extent that the law requires that materials and equipment capable of diversion to religious issues will not be supplied." App. 36.[16] Equipment provided under the predecessor statute, invalidated as set forth in n. 1, *supra,* included projectors, tape recorders, record players, maps and globes, science kits, weather forecasting charts, and the like. The District Court, 417 F. Supp., at 1117, found the new statute, as now limited, constitutional because the court could not distinguish the loan of material and equipment from the textbook provisions upheld in *Meek,* 421 U. S., at 359–362, and in *Allen,* 392 U. S., at 248.

In *Meek,* however, the Court considered the constitutional validity of a direct loan to nonpublic schools of instructional material and equipment, and, despite the apparent secular nature of the goods, held the loan impermissible. MR. JUSTICE STEWART, in writing for the Court, stated:

> "The very purpose of many of those schools is to provide an integrated secular and religious education; the teach-

---

[16] Counsel for the private appellees suggested at oral argument that the material and equipment were further limited to those items "lendable to a pupil for individual use." Tr. of Oral Arg. 31. This assertion, however, appears to be contrary to the stipulation, App. 36, to the representation of the state appellees, Tr. of Oral Arg. 21, and to the understanding of the District Court, 417 F. Supp., at 1118. In any event, a meaningful distinction cannot be drawn between equipment used on a collective basis and that used individually. All materials and equipment must be used to supplement courses, App. 37, and their value derives from the support they provide to the collective educational enterprise.

ing process is, to a large extent, devoted to the inculcation of religious values and belief. See *Lemon* v. *Kurtzman,* 403 U. S., at 616–617. Substantial aid to the educational function of such schools, accordingly, necessarily results in aid to the sectarian school enterprise as a whole. '[T]he secular education those schools provide goes hand in hand with the religious mission that is the only reason for the schools' existence. Within the institution, the two are inextricably intertwined.' *Id.,* at 657 (opinion of BRENNAN, J.)." 421 U. S., at 366.

Thus, even though the loan ostensibly was limited to neutral and secular instructional material and equipment, it inescapably had the primary effect of providing a direct and substantial advancement of the sectarian enterprise.

Appellees seek to avoid *Meek* by emphasizing that it involved a program of direct loans to nonpublic schools. In contrast, the material and equipment at issue under the Ohio statute are loaned to the pupil or his parent. In our view, however, it would exalt form over substance if this distinction were found to justify a result different from that in *Meek*. Before *Meek* was decided by this Court, Ohio authorized the loan of material and equipment directly to the nonpublic schools. Then, in light of *Meek*, the state legislature decided to channel the goods through the parents and pupils. Despite the technical change in legal bailee, the program in substance is the same as before: The equipment is substantially the same; it will receive the same use by the students; and it may still be stored and distributed on the nonpublic school premises. In view of the impossibility of separating the secular education function from the sectarian, the state aid inevitably flows in part in support of the religious role of the schools.

Indeed, this conclusion is compelled by the Court's prior consideration of an analogous issue in *Committee for Public Education* v. *Nyquist,* 413 U. S. 756 (1973). There the Court considered, among others, a tuition reimbursement program

whereby New York gave low-income parents who sent their children to nonpublic schools a direct and unrestricted cash grant of $50 to $100 per child (but no more than 50% of tuition actually paid). The State attempted to justify the program, as Ohio does here, on the basis that the aid flowed to the parents rather than to the church-related schools. The Court observed, however, that, unlike the bus program in *Everson* v. *Board of Education*, 330 U. S. 1 (1947), and the book program in *Allen*, there "has been no endeavor 'to guarantee the separation between secular and religious educational functions and to ensure that State financial aid supports only the former.'" 413 U. S., at 783, quoting *Lemon* v. *Kurtzman*, 403 U. S., at 613. The Court thus found that the grant program served to establish religion. If a grant in cash to parents is impermissible, we fail to see how a grant in kind of goods furthering the religious enterprise can fare any better.[17] Accordingly, we hold §§ 3317.06 (B) and (C) to be unconstitutional.[18]

---

[17] In many respects, *Nyquist* was a more difficult case than the present one. First, it was at least arguable in *Nyquist* that the tuition grant did not end up in the hands of the religious schools since the parent was free to spend the grant money as he chose. 413 U. S., at 785–786. No similar argument could be made here since the parties have stipulated expressly that material and equipment must be used to supplement courses. App. 37. Second, since the grant in *Nyquist* was limited to 50% of tuition, it was arguable that the grant should be seen as supporting only the secular part of the church-school enterprise. 413 U. S., at 787. An argument of that kind also could not be made here, for *Meek* makes clear that the material and equipment are inextricably connected with the church-related school's religious function.

[18] There is, as there was in *Meek*, a tension between this result and *Board of Education* v. *Allen*, 392 U. S. 236 (1968). *Allen* was premised on the view that the educational content of textbooks is something that can be ascertained in advance and cannot be diverted to sectarian uses. In *Nyquist* the Court explained:

"In *Everson*, the Court found the bus fare program analogous to the provision of services such as police and fire protection, sewage disposal, highways, and sidewalks for parochial schools. 330 U. S., at 17–18. Such

## VIII

### Field Trips

Section 3317.06 also authorizes expenditures of funds:

"(L) To provide such field trip transportation and services to nonpublic school students as are provided to public school students in the district. School districts may contract with commercial transportation companies for such transportation service if school district busses ·are unavailable."

There is no restriction on the timing of field trips; the only restriction on number lies in the parallel the statute draws to field trips provided to public school students in the district. The parties have stipulated that the trips "would consist of visits to governmental, industrial, cultural, and scientific centers designed to enrich the secular studies of students."

services, provided in common to all citizens, are 'so separate and so indisputably marked off from the religious function,' *id.*, at 18, that they may fairly be viewed as reflections of a neutral posture toward religious institutions. *Allen* is founded upon a similar principle. The Court there repeatedly emphasized that upon the record in that case there was no indication that textbooks would be provided for anything other than purely secular courses." 413 U. S., at 781–782.

*Board of Education* v. *Allen* has remained law, and we now follow as a matter of *stare decisis* the principle that restriction of textbooks to those provided the public schools is sufficient to ensure that the books will not be used for religious purposes. In more recent cases, however, we have declined to extend that presumption of neutrality to other items in the lower school setting. See *Meek*, 421 U. S., at 362–366; *Levitt*, 413 U. S., at 481–482. Compare *Nyquist*, 413 U. S., at 774–780, with *Tilton* v. *Richardson*, 403 U. S. 672 (1971). It has been argued that the Court should extend *Allen* to cover all items similar to textbooks. See *Meek*, 421 U. S., at 385 (BURGER, C. J., concurring in judgment in part and dissenting in part); *id.*, at 390–391 (REHNQUIST, J., concurring in judgment in part and dissenting in part). When faced, however, with a choice between extension of the unique presumption created in *Allen* and continued adherence to the principles announced in our subsequent cases, we choose the latter course.

App. 49. The choice of destination, however, will be made by the nonpublic school teacher from a wide range of locations.

The District Court, 417 F. Supp., at 1124–1125, held this feature to be constitutionally indistinguishable from that with which the Court was concerned in *Everson* v. *Board of Education*, 330 U. S. 1 (1947). We do not agree. In *Everson* the Court approved a system under which a New Jersey board of education reimbursed parents for the cost of sending their children to and from school, public or parochial, by public carrier. The Court analogized the reimbursement to situations where a municipal common carrier is ordered to carry all schoolchildren at a reduced rate, or where the police force is ordered to protect all children on their way to and from school. *Id.*, at 17. The critical factors in these examples, as in the *Everson* reimbursement system, are that the school has no control over the expenditure of the funds and the effect of the expenditure is unrelated to the content of the education provided. Thus, the bus fare program in *Everson* passed constitutional muster because the school did not determine how often the pupil traveled between home and school—every child must make one round trip every day—and because the travel was unrelated to any aspect of the curriculum.

The Ohio situation is in sharp contrast. First, the nonpublic school controls the timing of the trips and, within a certain range, their frequency and destinations. Thus, the schools, rather than the children, truly are the recipients of the service and, as this Court has recognized, this fact alone may be sufficient to invalidate the program as impermissible direct aid. See *Lemon* v. *Kurtzman*, 403 U. S., at 621. Second, although a trip may be to a location that would be of interest to those in public schools, it is the individual teacher who makes a field trip meaningful. The experience begins with the study and discussion of the place to be visited; it continues on location with the teacher pointing out items of interest and stimulating the imagination; and it ends with a

discussion of the experience. The field trips are an integral part of the educational experience, and where the teacher works within and for a sectarian institution, an unacceptable risk of fostering of religion is an inevitable byproduct. See *Meek* v. *Pittenger,* 421 U. S., at 366. In *Lemon* the Court stated:

> "We need not and do not assume that teachers in parochial schools will be guilty of bad faith or any conscious design to evade the limitations imposed by the statute and the First Amendment. We simply recognize that a dedicated religious person, teaching in a school affiliated with his or her faith and operated to inculcate its tenets, will inevitably experience great difficulty in remaining religiously neutral." 403 U. S., at 618.

Funding of field trips, therefore, must be treated as was the funding of maps and charts in *Meek* v. *Pittenger, supra,* the funding of buildings and tuition in *Committee for Public Education* v. *Nyquist, supra,* and the funding of teacher-prepared tests in *Levitt* v. *Committee for Public Education, supra;* it must be declared an impermissible direct aid to sectarian education.

Moreover, the public school authorities will be unable adequately to insure secular use of the field trip funds without close supervision of the nonpublic teachers. This would create excessive entanglement:

> "A comprehensive, discriminating, and continuing state surveillance will inevitably be required to ensure that these restrictions are obeyed and the First Amendment otherwise respected. Unlike a book, a teacher cannot be inspected once so as to determine the extent and intent of his or her personal beliefs and subjective acceptance of the limitations imposed by the First Amendment. These prophylactic contacts will involve excessive and enduring entanglement between state and church." *Lemon* v. *Kurtzman,* 403 U. S., at 619.

See also *Roemer* v. *Maryland Public Works Bd.*, 426 U. S., at 749.

We hold § 3317.06 (L) to be unconstitutional.

## IX

In summary, we hold constitutional those portions of the Ohio statute authorizing the State to provide nonpublic school pupils with books, standardized testing and scoring, diagnostic services, and therapeutic and remedial services. We hold unconstitutional those portions relating to instructional materials and equipment and field trip services.

The judgment of the District Court is therefore affirmed in part and reversed in part.

*It is so ordered.*

THE CHIEF JUSTICE dissents from Parts VII and VIII of the Court's opinion.

For the reasons stated in MR. JUSTICE REHNQUIST's separate opinion in *Meek* v. *Pittenger,* 421 U. S. 349 (1975), and MR. JUSTICE WHITE's dissenting opinion in *Committee for Public Education* v. *Nyquist,* 413 U. S. 756 (1973), MR. JUSTICE WHITE and MR. JUSTICE REHNQUIST concur in the judgment with respect to textbooks, testing and scoring, and diagnostic and therapeutic services (Parts III, IV, V and VI of the opinion) and dissent from the judgment with respect to instructional materials and equipment and field trips (Parts VII and VIII of the opinion).

MR. JUSTICE BRENNAN, concurring in part and dissenting in part.

I join Parts I, VII, and VIII of the Court's opinion, and the reversal of the District Court's judgment insofar as that judgment upheld the constitutionality of Ohio Rev. Code Ann. §§ 3317.06 (B), (C), and (L) (Supp. 1976).

I dissent however from Parts II, III, and IV (plurality opinion) and Parts V and VI of the Court's opinion and the affirm-

ance of the District Court's judgment insofar as it sustained the constitutionality of §§ 3317.06 (A), (D), (F), (G), (H), (I), (J), and (K). The Court holds that Ohio has managed in these respects to fashion a statute that avoids an effect or entanglement condemned by the Establishment Clause. But "[t]he [First] Amendment nullifies sophisticated as well as simpleminded . . ." attempts to avoid its prohibitions, *Lane* v. *Wilson,* 307 U. S. 268, 275 (1939), and, in any event, ingenuity in draftsmanship cannot obscure the fact that this subsidy to sectarian schools amounts to $88,800,000 (less now the sums appropriated to finance §§ 3317.06 (B) and (C) which today are invalidated) just for the initial biennium. The Court nowhere evaluates this factor in determining the compatibility of the statute with the Establishment Clause, as that Clause requires, *Everson* v. *Board of Education,* 330 U. S. 1, 16 (1947). Its evaluation, even after deduction of the amount appropriated to finance §§ 3317.06 (B) and (C), compels in my view the conclusion that a divisive political potential of unusual magnitude inheres in the Ohio program. This suffices without more to require the conclusion that the Ohio statute in its entirety offends the First Amendment's prohibition against laws "respecting an establishment of religion." *Meek* v. *Pittenger,* 421 U. S. 349, 373–385 (1975) (BRENNAN, J., concurring); *Lemon* v. *Kurtzman,* 403 U. S. 602, 640–642 (1971) (Douglas, J., concurring); *Everson* v. *Board of Education, supra,* at 16.

MR. JUSTICE MARSHALL, concurring in part and dissenting in part.

I join Parts I, V, VII, and VIII of the Court's opinion. For the reasons stated below, however, I am unable to join the remainder of the Court's opinion or its judgment upholding the constitutionality of Ohio Rev. Code Ann. §§ 3317.06 (A), (G), (H), (I), (J), and (K) (Supp. 1976).

The Court upholds the textbook loan provision, § 3317.06 (A), on the precedent of *Board of Education* v. *Allen,* 392

U. S. 236 (1968). *Ante,* at 236–238. It also recognizes, however, that there is "a tension" between *Allen* and the reasoning of the Court in *Meek* v. *Pittenger,* 421 U. S. 349 (1975). I would resolve that tension by overruling *Allen.* I am now convinced that *Allen* is largely responsible for reducing the "high and impregnable" wall between church and state erected by the First Amendment, *Everson* v. *Board of Education,* 330 U. S. 1, 18 (1947), to "a blurred, indistinct, and variable barrier," *Lemon* v. *Kurtzman,* 403 U. S. 602, 614 (1971), incapable of performing its vital functions of protecting both church and state.

In *Allen,* we upheld a textbook loan program on the assumption that the sectarian school's twin functions of religious instruction and secular education were separable. 392 U. S., at 245–248. In *Meek,* we flatly rejected that assumption as a basis for allowing a State to loan secular teaching materials and equipment to such schools:

> "The very purpose of many of those schools is to provide an integrated secular and religious education; the teaching process is, to a large extent, devoted to the inculcation of religious values and belief. . . . Substantial aid to the educational function of such schools, accordingly, necessarily results in aid to the sectarian school enterprise as a whole. '[T]he secular education those schools provide goes hand in hand with the religious mission that is the only reason for the schools' existence. Within the institution, the two are inextricably intertwined.' [*Lemon* v. *Kurtzman, supra,* at 657] (opinion of BRENNAN, J.)." 421 U. S., at 366.

Thus, although *Meek* upheld a textbook loan program on the strength of *Allen,* it left the rationale of *Allen* undamaged only if there is a constitutionally significant difference between a loan of pedagogical materials directly to a sectarian school and a loan of those materials to students for use in sectarian

schools. As the Court convincingly demonstrates, *ante,* at 249–250, there is no such difference.

*Allen* has also been undercut by our recognition in *Lemon* that "the divisive political potential" of programs of aid to sectarian schools is one of the dangers of entanglement of church and state that the First Amendment was intended to forestall. 403 U. S., at 622–624. We were concerned in *Lemon* with the danger that the need for annual appropriations of larger and larger sums would lead to "[p]olitical fragmentation and divisiveness on religious lines." *Id.,* at 623. This danger exists whether the appropriations are made to fund textbooks, other instructional supplies, or, as in *Lemon,* teachers' salaries. As MR. JUSTICE BRENNAN has noted, *Allen* did not consider the significance of the potential for political divisiveness inherent in programs of aid to sectarian schools. *Meek* v. *Pittenger, supra,* at 378 (concurring in part and dissenting in part).

It is, of course, unquestionable that textbooks are central to the educational process.[1] Under the rationale of *Meek,* therefore, they should not be provided by the State to sectarian schools [2] because "[s]ubstantial aid to the educational function of such schools . . . necessarily results in aid to the sectarian school enterprise as a whole." 421 U. S., at 366. It is

---

[1] See *Meek* v. *Pittenger,* 421 U. S., at 384 (BRENNAN, J., concurring in part and dissenting in part); *Board of Education* v. *Allen,* 392 U. S., at 252 (Black, J., dissenting).

[2] Although the texts are formally loaned to the students or their parents, the reality is that they are provided to the school. The school has the power to choose the books to be provided, since the statute defines "textbook" as " 'any book or book substitute which a pupil uses as a text or text substitute in a particular class or program in the school he regularly attends.' " *Ante,* at 237. The school will distribute "loan request" forms to the students, collect them, and submit them to the public authority which provides the books. The record is silent as to whether the books will be returned to the public authority or stored at the school during the summer recess.

also unquestionable that the cost of textbooks is certain to be substantial. Under the rationale of *Lemon,* therefore, they should not be provided because of the dangers of political "divisiveness on religious lines." I would, accordingly, overrule *Board of Education* v. *Allen* and hold unconstitutional § 3317.06 (A).[3]

By overruling *Allen,* we would free ourselves to draw a line between acceptable and unacceptable forms of aid that would be both capable of consistent application and responsive to the concerns discussed above. That line, I believe, should be placed between general welfare programs that serve children in sectarian schools because the schools happen to be a convenient place to reach the programs' target populations and programs of educational assistance.[4] General welfare programs, in contrast to programs of educational assistance, do not provide "[s]ubstantial aid to the educational function" of schools,[5] 421 U. S., at 366, whether secular or sectarian, and therefore do not provide the kind of assistance to the religious

---

[3] Our experience with *Allen* bears out the warning of THE CHIEF JUSTICE:

"[I]n constitutional adjudication some steps, which when taken were thought to approach 'the verge,' have become the platform for yet further steps. A certain momentum develops in constitutional theory and it can be a 'downhill thrust' easily set in motion but difficult to retard or stop." *Lemon* v. *Kurtzman,* 403 U. S. 602, 624 (1971).

The tension between *Allen* and *Meek* indicates that we must soon either remove the platform or take the plunge into new realms of state assistance to sectarian institutions.

[4] This is the line advocated by Mr. Justice Black, dissenting in *Board of Education* v. *Allen, supra,* at 250–254. Mr. Justice Black was the author of the Court's opinion in *Everson* v. *Board of Education,* 330 U. S. 1 (1947), on which the opinion in *Allen* was based.

[5] To some extent, of course, any program that improves the general well-being of a student may assist his education. The distinction is between programs that help the school educate a student and welfare programs that may have the effect of making a student more receptive to being educated.

mission of sectarian schools we found impermissible in *Meek.* Moreover, because general welfare programs do not assist the sectarian functions of denominational schools, there is no reason to expect that political disputes over the merits of those programs will divide the public along religious lines.

In addition to § 3317.06 (A), which authorizes the textbook loan program, paragraphs (B), (C), and (L), held unconstitutional by the Court, clearly fall on the wrong side of the constitutional line I propose. Those paragraphs authorize, respectively, the loan of instructional materials and equipment and the provision of transportation for school field trips. There can be no contention that these programs provide anything other than educational assistance.

I also agree with the Court that the services authorized by paragraphs (D), (F), and (G) are constitutionally permissible. Those services are speech and hearing diagnosis, psychological diagnosis, and psychological and speech and hearing therapy. Like the medical, nursing, dental, and optometric services authorized by paragraph (E) and not challenged by appellants, these services promote the children's health and well-being, and have only an indirect and remote impact on their educational progress.[6]

The Court upholds paragraphs (H), (I), and (K), which it groups with paragraph (G), under the rubric of "therapeutic services." *Ante,* at 244–248. I cannot agree that the services

---

[6] Appellants argue that these programs are impermissible because the diagnostic and therapeutic personnel may be influenced to indoctrinate the pupils with whom they deal in the tenets of the sect that runs the sectarian school. I agree that if this danger were real, it would militate strongly against upholding these services. Appellants do not explain, however, why it is any more likely that a hearing test will become an occasion for indoctrination than that an eye chart will be used to deliver religious messages. (Appellants do not challenge the provision of diagnostic optometric services.) While constitutional adjudication must be sensitive to the danger of subtle abuses, it cannot be based on fear of imaginable but totally implausible evils.

authorized by these three paragraphs should be treated like the psychological services provided by paragraph (G). Paragraph (H) authorizes the provision of guidance and counseling services. The parties stipulated that the functions to be performed by the guidance and counseling personnel would include assisting students in "developing meaningful educational and career goals," and "planning school programs of study." In addition, these personnel will discuss with parents "their children's a) educational progress and needs, b) course selections, c) educational and vocational opportunities and plans, and d) study skills." The counselors will also collect and organize information for use by parents, teachers, and students. App. 45–46. This description makes clear that paragraph (H) authorizes services that would directly support the educational programs of sectarian schools. It is, therefore, in violation of the First Amendment.

Paragraphs (I) and (K) provide remedial services and programs for disabled children. The stipulation of the parties indicates that these paragraphs will fund specialized teachers who will both provide instruction themselves and create instructional plans for use in the students' regular classrooms. *Id.,* at 47–48. These "therapeutic services" are clearly intended to aid the sectarian schools to improve the performance of their students in the classroom. I would not treat them as if they were programs of physical or psychological therapy.

Finally, the Court upholds paragraph (J), which provides standardized tests and scoring services, on the ground that these tests are clearly nonideological and that the State has an interest in assuring that the education received by sectarian school students meets minimum standards. I do not question the legitimacy of this interest, and if Ohio required students to obtain specified scores on certain tests before being promoted or graduated, I would agree that it could administer those tests to sectarian school students to ensure that its standards were being met. The record indicates, however, only that the tests

"are used to measure the progress of students in secular subjects." *Id.*, at 48. It contains no indication that the measurements are taken to assure compliance with state standards rather than for internal administrative purposes of the schools. To the extent that the testing is done to serve the purposes of the sectarian schools rather than the State, I would hold that its provision by the State violates the First Amendment.

Mr. Justice Powell, concurring in part, concurring in the judgment in part, and dissenting in part.

Our decisions in this troubling area draw lines that often must seem arbitrary. No doubt we could achieve greater analytical tidiness if we were to accept the broadest implications of the observation in *Meek* v. *Pittenger,* 421 U. S. 349, 366 (1975), that "[s]ubstantial aid to the educational function of [sectarian] schools . . . necessarily results in aid to the sectarian enterprise as a whole." If we took that course, it would become impossible to sustain state aid of any kind— even if the aid is wholly secular in character and is supplied to the pupils rather than the institutions. *Meek* itself would have to be overruled, along with *Board of Education* v. *Allen,* 392 U. S. 236 (1968), and even perhaps *Everson* v. *Board of Education,* 330 U. S. 1 (1947). The persistent desire of a number of States to find proper means of helping sectarian education to survive would be doomed. This Court has not yet thought that such a harsh result is required by the Establishment Clause. Certainly few would consider it in the public interest. Parochial schools, quite apart from their sectarian purpose, have provided an educational alternative for millions of young Americans; they often afford wholesome competition with our public schools; and in some States they relieve substantially the tax burden incident to the operation of public schools. The State has, moreover, a legitimate interest in facilitating education of the highest quality for all children within its boundaries, whatever school their parents have chosen for them.

It is important to keep these issues in perspective. At this point in the 20th century we are quite far removed from the dangers that prompted the Framers to include the Establishment Clause in the Bill of Rights. See *Walz* v. *Tax Comm'n,* 397 U. S. 664, 668 (1970). The risk of significant religious or denominational control over our democratic processes—or even of deep political division along religious lines—is remote, and when viewed against the positive contributions of sectarian schools, any such risk seems entirely tolerable in light of the continuing oversight of this Court. Our decisions have sought to establish principles that preserve the cherished safeguard of the Establishment Clause without resort to blind absolutism. If this endeavor means a loss of some analytical tidiness, then that too is entirely tolerable. Most of the Court's decision today follows in this tradition, and I join Parts I through VI of the opinion.

With respect to Part VII, I concur only in the judgment. I am not persuaded, nor did *Meek* hold, that all loans of secular instructional material and equipment "inescapably [have] the primary effect of providing a direct and substantial advancement of the sectarian enterprise." *Ante,* at 250. If that were the case, then *Meek* surely would have overruled *Allen.* Instead the Court reaffirmed *Allen,* thereby necessarily holding that at least some such loans of materials helpful in the educational process are permissible—so long as the aid is incapable of diversion to religious uses, cf. *Committee for Public Education* v. *Nyquist,* 413 U. S. 756 (1973), and so long as the materials are lent to the individual students or their parents and not to the sectarian institutions. Here the statute is expressly limited to materials incapable of diversion. Therefore the relevant question is whether the materials are such that they are "furnished for the use of *individual* students and at their request." *Allen, supra,* at 244 n. 6 (emphasis added).

The Ohio statute includes some materials such as wall maps,

charts, and other classroom paraphernalia for which the concept of a loan to individuals is a transparent fiction. A loan of these items is indistinguishable from forbidden "direct aid" to the sectarian institution itself, whoever the technical bailee. See *Meek, supra,* at 362–366. Since the provision makes no attempt to separate these instructional materials from others meaningfully lent to individuals, I agree with the Court that it cannot be sustained under our precedents. But I would find no constitutional defect in a properly limited provision lending to the individuals themselves only appropriate instructional materials and equipment similar to that customarily used in public schools.

I dissent as to Part VIII, concerning field trip transportation. The Court writes as though the statute funded the salary of the teacher who takes the students on the outing. In fact only the bus and driver are provided for the limited purpose of physical movement between the school and the secular destination of the field trip. As I find this aid indistinguishable in principle from that upheld in *Everson, supra,* I would sustain the District Court's judgment approving this part of the Ohio statute.

MR. JUSTICE STEVENS, concurring in part and dissenting in part.

The distinction between the religious and the secular is a fundamental one. To quote from Clarence Darrow's argument in the *Scopes* case:

> "The realm of religion . . . is where knowledge leaves off, and where faith begins, and it never has needed the arm of the State for support, and wherever it has received it, it has harmed both the public and the religion that it would pretend to serve." [1]

---

[1] Tr. of Oral Arg. 7, *Scopes* v. *State,* 154 Tenn. 105, 289 S. W. 363 (1927) (on file with Clarence Darrow Papers, Library of Congress) (punctuation corrected).

The line drawn by the Establishment Clause of the First Amendment must also have a fundamental character. It should not differentiate between direct and indirect subsidies, or between instructional materials like globes and maps on the one hand and instructional materials like textbooks on the other. For that reason, rather than the three-part test described in Part II of the plurality's opinion, I would adhere to the test enunciated for the Court by Mr. Justice Black:

> "No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion." *Everson* v. *Board of Education,* 330 U. S. 1, 16.

Under that test, a state subsidy of sectarian schools is invalid regardless of the form it takes. The financing of buildings, field trips, instructional materials, educational tests, and schoolbooks are all equally invalid.[2] For all give aid to the school's educational mission, which at heart is religious.[3] On the other hand, I am not prepared to exclude the possibility

---

[2] In view of the acknowledged tension, *ante,* at 251–252, n. 18, between *Board of Education* v. *Allen,* 392 U. S. 236, and *Meek* v. *Pittenger,* 421 U. S. 349, the doctrine of *stare decisis* cannot foreclose an eventual choice between two inconsistent precedents.

[3] It is the sectarian school itself, not the legislation, that is "entangled" with religion:

"The very purpose of many of those schools is to provide an integrated secular and religious education; the teaching process is, to a large extent, devoted to the inculcation of religious values and belief. See *Lemon* v. *Kurtzman,* 403 U. S., at 616–617. Substantial aid to the educational function of such schools, accordingly, necessarily results in aid to the sectarian school enterprise as a whole. '[T]he secular education those schools provide goes hand in hand with the religious mission that is the only reason for the schools' existence. Within the institution, the two are inextricably intertwined.' *Id.,* at 657 (opinion of BRENNAN, J.). See generally Freund, Public Aid to Parochial Schools, 82 Harv. L. Rev. 1680, 1688–1689." *Meek* v. *Pittenger, supra,* at 366.

that some parts of the statute before us may be administered in a constitutional manner. The State can plainly provide public health services to children attending nonpublic schools. The diagnostic and therapeutic services described in Parts V and VI of the Court's opinion may fall into this category.[4] Although I have some misgivings on this point, I am not prepared to hold this part of the statute invalid on its face.

This Court's efforts to improve on the *Everson* test have not proved successful. "Corrosive precedents"[5] have left us without firm principles on which to decide these cases. As this case demonstrates, the States have been encouraged to search for new ways of achieving forbidden ends. See *Committee for Public Education* v. *Nyquist,* 413 U. S. 756, 785, 797. What should be a "high and impregnable" wall between church and state,[6] has been reduced to a " 'blurred, indistinct, and variable barrier,' " *ante,* at 236. The result has been, as Clarence Darrow predicted, harm to "both the public and the religion that [this aid] would pretend to serve."[7]

Accordingly, I dissent from Parts II, III, and IV of the plurality's opinion.

---

[4] Like my Brother BRENNAN, *ante,* at 256, I am concerned by the amount of money appropriated under this statute. But since the Court has invalidated so much of the program, only a much smaller amount may still be involved.

[5] *Everson,* 330 U. S., at 63 (Rutledge, J., dissenting).

[6] *Id.,* at 18.

[7] In *Roemer* v. *Maryland Public Works Bd.,* 426 U. S. 736, 775, I spoke of "the pernicious tendency of a state subsidy to tempt religious schools to compromise their religious mission without wholly abandoning it." This case presents an apt illustration. To qualify for aid, sectarian schools must relinquish their religious exclusivity. As the District Court noted, the statute provides aid "to pupils attending only those nonpublic schools whose admission policies make no distinction as to . . . creed . . . of either its pupils or of its teachers." *Wolman* v. *Essex,* 417 F. Supp. 1113, 1116. Similarly, sectarian schools will be under pressure to avoid textbooks which present a religious perspective on secular subjects, so as to obtain the free textbooks provided by the State.