In the Matter of the Determination of Unemployment Insurance Coverage of NORTHWESTERN LUTHERAN ACADEMY and St. Martin's Evangelical Lutheran School.

No. 12801.

Supreme Court of South Dakota.

Argued Oct. 10, 1979.

Decided March 26, 1980.

Rehearing Denied May 2, 1980.

Judith A. Atkinson, Asst. Atty. Gen., Pierre, for appellant, State of South Dakota; Mark V. Meierhenry, Atty. Gen., Pierre, on the brief.

E. Thomas Schilling, von Briesen & Redmond, Milwaukee, Wis., Rory King, Siegel, Barnett, Schutz, O'Keefe, Jewett & King, Aberdeen, for appellees, Northwestern Lutheran Academy and St. Martin's Evangelical Lutheran School.

FOSHEIM, Justice.

The State of South Dakota appeals from a judgment of the circuit court exempting respondents Northwestern Lutheran Academy and St. Martin's Evangelical Lutheran School from liability for payment of unemployment tax on their school personnel. We reverse.

Northwestern Lutheran Academy (NLA) is a four-year preparatory school for entrance to Northwestern College or Dr. Martin Luther College. At these latter institutions, students are trained for the ministry of the Wisconsin Evangelical Lutheran Synod. St. Martin's Evangelical Lutheran School (St. Martin's) is an elementary school operated by St. Martin's Evangelical Lutheran Church.[1] Both respondent schools have four or more employees exclusive of those found to be ordained, commissioned or licensed ministers in the exercise of their ministry.

Prior to January 1, 1978, the Federal Unemployment Tax Act (FUTA) permitted states to exempt certain services from taxation.[2] These exemptions from unemployment tax liability were codified in South

---

1. NLA, owned and operated by the Wisconsin Synod, and St. Martin's Church, separately incorporated as a church under South Dakota law, are both members of the Wisconsin Synod and exempt from income tax liability under Section 501 of the Internal Revenue Code (26 U.S.C.A. § 501) (1967)).

2. 26 U.S.C.A. § 3301 et seq. FUTA is a comprehensive plan for unemployment compensation allowing for state and federal participation in its administration. Section 3301 of the Act imposes a federal unemployment tax, but Section 3302 of the Act permits tax credits against the federal tax for employers who have paid money into federally approved state unemployment tax funds. In order for a state to participate in the federal plan, it must meet certain requirements set out under Sections 3303 and 3304. While the respondents are exempted from the federal unemployment tax by Section 3306(c)(8), Sections 3304(a)(6) and 3309 require participating states to tax certain charitable organizations exempted from the federal tax.

Dakota in SDCL 61–1–10.4, which provided that employment covered did not include services performed:

. . . . .

(1) In the employ of
(a) a church or convention or association of churches, or
(b) an organization which is operated primarily for religious purposes and which is operated, supervised, controlled, or principally supported by a church or convention or association of churches; or

(2) By a duly ordained, commissioned, or licensed minister of a church in the exercise of his ministry or by a member of a religious order in the exercise of duties required by such order; or

(3) In the employ of a school other than a state school which is not an institution of higher education[.]

. . . . .

In 1976, Congress amended FUTA[3] and, as required by that amendment, the South Dakota Legislature in effect repealed subsection (3) of SDCL 61–1–10.4.

In April of 1978, the Secretary of Labor, charged with administration of FUTA, was called upon to determine whether church-related schools were exempt from state unemployment tax under Section 3309(b)(1) (corresponding to SDCL 61–1–10.4(1)). The Secretary's opinion, announced in a letter of April 18, 1978, addressed to the Most Reverend Thomas C. Kelly, General Secretary of the United States Catholic Conference, declared:

The repeal by Congress of the exclusion, in Section 3309(b)(3) of the Federal Unemployment Tax Act, of employees of elementary and secondary schools was clearly intended to result in State coverage of church related schools, whose employees constitute over 80% of the employees of all non-profit schools. In light of the repeal of 3309(b)(3), we think the only services performed in the schools

that may reasonably be considered within the scope of the exclusion permitted by 3309(b)(1) are those strictly church duties performed by church employees pursuant to their religious responsibilities within the school.

The Secretary's opinion resulted in a directive issued to all state employment agencies participating in the federal program, requiring such agencies to be able to assess unemployment compensation taxes against church-related schools in their states. The extension of this coverage under state law is a mandatory condition precedent to certification by the Secretary of Labor that the state statute conforms to federal standards; the Secretary's certification, in turn, provides access to the system of tax credits and federal reimbursement of certain benefit costs.

The State of South Dakota, in order to continue its participation in FUTA, issued a determination that both NLA and St. Martin's School are employers subject to coverage by the South Dakota Unemployment Insurance Law. This decision was reviewed by the Appeals Referee for the South Dakota Department of Labor whose decision found the schools subject to coverage, but that pastors and male teachers were exempt from coverage as ministers of a church in the exercise of their ministry, under SDCL 61–1–10.4(2). On appeal to the circuit court, the Appeals Referee was reversed and NLA and St. Martin's were both found to be exempt from coverage under the South Dakota Unemployment Insurance Law.

I

■ The threshold question on appeal involves a determination of congressional intent with respect to the repeal of Section 3309(b)(3) of FUTA (which resulted in the effective repeal of SDCL 61–1–10.4(3)). Respondents submit that the removal of the exclusion from unemployment compensation tax liability for school employment was

3. The Unemployment Compensation Amendments Act of 1976, Pub.L.No. 94–566, 90 Stat. 2667.

meant only to extend coverage to private, nonparochial schools and did not affect the exclusion from coverage of parochial schools. An examination of the recent legislative background of FUTA, however, indicates otherwise. The Employment Security Amendments of 1970, by adding new language to various sections of FUTA,[4] required state law coverage of individuals employed by nonprofit organizations (including institutions of higher education). The committee reports accompanying the amendments demonstrate that Congress intended to extend coverage to individuals employed in nonprofit organizations, including religious organizations. The House Ways and Means Committee explained that:

> Under existing Federal law, services performed for nonprofit *religious, charitable, educational* and humane organizations for a State and its political subdivisions are *exempt from the tax provisions of the Federal Unemployment Tax Act.* While employment in these organizations and governments is not subject to fluctuations to the same degree as in commerce and industry, unemployment affects a substantial number of their employees, particularly people working in nonprofessional occupations.
>
> Your committee does not want to change the present tax status of nonprofit organizations, but it is concerned about the need of their employees for protection against wage loss resulting from unemployment.

H.R.Rep.No. 612, 91 Cong., 1st Sess. 11 (1969) (emphasis supplied). The Committee went on to delineate more clearly the limits of the Section 3309(b)(1) exemption (correlative to SDCL 61–1–10.4(1)) as applied to institutions of higher education:

> This paragraph excludes services of persons where the employer is a church or convention or association of churches, but does not exclude certain services performed for an organization which may be religious in orientation unless it is operated primarily for religious purposes and is operated, supervised, controlled, or principally supported by a church or (convention or association of churches). Thus, services of the janitor of a church would be excluded but services of a janitor for a separately incorporated college, although it may be church related, would be covered. A college devoted primarily to preparing students for the ministry would be exempt, as would a novitiate or house of study training candidates to become members of religious orders. On the other hand, a church related (separately incorporated) charitable organization (such as, for example, an orphanage or a home for the aged) would not be considered under this paragraph to be operated primarily for religious purposes.

H.R.Rep.No. 612, 91 Cong., 1st Sess. 44 (1969). Identical language is found in S.Rep.No. 752, 91 Cong., 2nd Sess. (1970), at 48–59, U.S.Code Cong. & Admin. News 1970, p. 3606.

We conclude from our reading of the 1970 congressional revisions and the accompanying legislative reports that Congress expected the "operated primarily for religious purposes" language in Section 3309(b)(1)(B) (corresponding to that in SDCL 61–1–10.-4(1)(b)) to be narrowly construed, at least as applied to educational institutions. The Department of Labor has adhered to this congressional mandate and consistently interpreted the 1970 amendments as requiring state unemployment coverage of all institutions of higher education except for the narrow category including seminaries and novitiates which are devoted exclusively to religious training and indoctrination.

In view of Congress' apparent intention in 1970 to bring religiously affiliated institutions of higher education within coverage, and in light of the Labor Department's subsequent adoption of this interpretation, Congress' description of the objective behind the 1976 repeal of Section 3309(b)(3) (culminating in the repeal of SDCL 61–1–10.4(3)) is informative. According to Congress, the repeal of this section "has the

---

4. §§ 3304(a)(6), 3306(c)(8) and 3309(a)(1)(A).

effect of requiring the State to pay unemployment compensation on the basis of services performed for *all* educational institutions. Under existing law, the State is only required to provide coverage of services performed for institutions of higher education." H.R.Rep.No. 755, 94th Cong., 1st Sess. 6 (1975) (emphasis supplied). As stated in the Senate Report on the bill:

> The bill would require the State to extend the coverage of their unemployment compensation programs to employees of nonprofit elementary and secondary schools (present law requires coverage for employees of institutions of higher education). The provisions for nonpayment of benefits during vacation periods to school employees of State and local governments would also apply to employees of nonprofit schools.

S.Rep.No. 1265, 94th Cong., 2d Sess. 2 (1976), U.S.Code Cong. & Admin.News, pp. 5997, 5998.

It is further significant that S.Rep.No. 1265, 94th Cong., 2d Sess. 8 (1976) estimated the number of new employees who would be covered as a result of the repeal of Section 3309(b)(3) at 242,000. This figure approximates the total number of teachers in all nonprofit elementary and secondary schools. Absent the inclusion of employees of church-related elementary and secondary schools, the figure would be considerably less than 242,000, because the teachers in such schools comprise more than half of the staff of all nonpublic elementary and secondary schools in the United States.[5]

██ Moreover, when faced with the problem of statutory construction, we must show great deference to the interpretation given such statutes by the agency charged with their administration. *Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). Shortly after the enactment of the 1970 amendments, the Department published its interpretation of those amendments

which stated that the exemption for services performed for churches or religious organizations did not extend to services performed for religiously affiliated institutions of higher education. The Department's view of the objective behind the 1976 amendments, expressed in the Secretary's letter, supra, is a logical and necessary extension of the position which the Department has taken without objection since 1970. We find further significance in the fact that Congress did not attempt in 1976 to alter the Department's interpretation of Section 3309(b)(1). The "failure of Congress to alter or amend . . . [a] section, notwithstanding this consistent construction by the department charged with its enforcement, creates a presumption in favor of the administrative interpretation, to which we should give great weight, even if we doubted the correctness of the ruling of the Department of Labor". *Costanzo v. Tillinghast,* 287 U.S. 341, 345, 53 S.Ct. 152, 154, 77 L.Ed. 350, 353 (1932).

## II

██ Having arrived at this determination of congressional intent, we must decide whether the South Dakota Unemployment Compensation Law infringes respondents' freedom of religion guaranteed by the First Amendment to the United States Constitution and Article VI, Section 3 of the South Dakota Constitution. In order to demonstrate that legislation conflicts with the Free Exercise Clause, "it is necessary . . . for one to show the coercive effect of the enactment as it operates against him in the practice of his religion." *School District of Abington v. Schempp,* 374 U.S. 203, 223, 83 S.Ct. 1560, 1572, 10 L.Ed.2d 844, 858 (1963). Although the First Amendment protection of religious belief is absolute, religiously based conduct "remains subject to regulation for the protection of society." *Cantwell v. Connecticut,* 310 U.S. 296, 303–304, 60 S.Ct. 900, 903, 84 L.Ed. 1213, 1218 (1940).

---

**5.** According to the Census Bureau's *Statistical Abstract of the United States* (1977), there were 261,000 full-time teachers in nonprofit elementary and secondary schools in 1975 of which 150,000 were in Roman Catholic Schools. Thus, it is clear that Congress contemplated that the repeal of § 3309(b)(3) would bring all elementary and secondary schools within the ambit of FUTA.

Thus, legislation that inhibits conduct mandated by religious convictions, if justified by "interests of the highest order and those not otherwise served can overbalance legitimate claims for the free exercise of religion." *Wisconsin v. Yoder,* 406 U.S. 205, 215, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15, 25 (1972).

Respondents do not outline any specific religious beliefs or practices that conflict with inclusion of their school personnel in the unemployment compensation program. Assuming, however, that their claim relates to the alleged financial burden that FUTA places upon them, they yet fail to meet their burden of demonstrating a violation of the Free Exercise Clause. The United States Supreme Court has refused to invalidate laws on free exercise grounds simply because they operate "so as to make the practice of . . . religious beliefs more expensive." *Braunfeld v. Brown,* 366 U.S. 599, 605, 81 S.Ct. 1144, 1147, 6 L.Ed.2d 563, 567 (1961). Neither does the unemployment insurance coverage in this case work in any manner to change the entire way of life of any persons associated with respondents. Cf., *Wisconsin v. Yoder,* supra. It is further significant that employers may meet their obligation by making reimbursement payments in lieu of contributions into the state unemployment compensation fund. *See:* Section 3304(a)(6)(b); Section 3309(a)(2). An employer electing the reimbursement method is liable only for those amounts paid out to former employees in the form of benefits. Such benefits are not automatically paid to all individuals who become unemployed; rather, certain eligibility requirements must be met before benefits are received and liability is incurred by an employer. This method, by which it is conceivable that no liability may occur, can not be characterized as "coercive" since it will have little, if any, impact upon respondents' religious practices.

Further, coverage of parochial school employees under the unemployment compensation tax law is permissible because it is justified by a compelling governmental interest. This interest is to provide a system of income maintenance for unemployed individuals so that they have the resources for food, shelter, and other necessities of life until they are able to secure other employment (or until the expiration of the statutorily prescribed period for the receipt of benefits). The United States Supreme Court has repeatedly upheld social and regulatory programs which feature important governmental interests, even though such programs may have an incidental effect upon free exercise of religion. *Braunfeld v. Brown,* supra; *McGowan v. Maryland,* 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961); *Prince v. Massachusetts,* 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944); *Reynolds v. United States,* 98 U.S. 145, 25 L.Ed. 244 (1878). Of further relevance are cases which have held that the failure to grant tax exemptions to religious organizations did not violate the free exercise clause. See, e. g., *Watchtower Bible and Tract Society v. Los Angeles County,* 181 F.2d 739 (9th Cir. 1950), *cert. denied,* 340 U.S. 820, 71 S.Ct. 51, 95 L.Ed. 602 (1950) (upholding state personal property tax levy upon religious literature). As noted in *Parker v. Commissioner,* 365 F.2d 792, 795 (8th Cir. 1966), *cert. denied,* 385 U.S. 1026, 87 S.Ct. 752, 17 L.Ed.2d 674 (1967):

> The receiving of an exemption is thus a matter of legislative grace and not a constitutional right. As long as exemptions are denied by the Commissioner upon a non-discriminatory basis using specific and reasonable guidelines and without inquiry into the merits of the particular religious doctrines, the withholding of religious exemptions is permissible under the Constitution.

Because the Secretary's interpretation of the amended statute, supra, avoids inquiry into the merits of any particular religious doctrine and will result in nondiscriminatory enforcement of FUTA as applied to all nonprofit elementary and secondary schools, the interpretation does not violate the Free Exercise Clause.

In *Mitchell v. Pilgrim Holiness Church Corp.,* 210 F.2d 879 (7th Cir. 1954), *cert. denied,* 347 U.S. 1013, 74 S.Ct. 867, 98 L.Ed.

1136, (1954) the court held that refusal to comply with the federal minimum wage law cannot be justified on religious grounds. The court there stated that the Fair Labor Standards Act "does not . . . *prohibit* the free exercise of religion by the defendant nor does it *lay a flat tax* on the privilege" (emphasis in original). 210 F.2d at 883. The court went on to state that the remedial character of the Fair Labor Standards Act—"to insure to the workers of the United States engaged in the production of goods for commerce a minimum wage sufficient to maintain a minimum standard of living"—justified any incidental impact upon their employer's free exercise of religion. Id., at 884. Similarly, in the present case, unemployment insurance coverage will have no more than a minimal impact on any religious practice. Further, the purposes of the unemployment compensation program—to insure that eligible persons will be able to maintain a minimum standard of living and that the detrimental effects of such unemployment will not have an adverse effect on the economy—are sufficiently compelling to override any incidental burden upon respondents' activities.

### III

Respondents contend that removal of the exemption would foster excessive entanglement between church and state in violation of the First Amendment. It is true that the inclusion of certain employees under the state's unemployment insurance law will necessarily call for increased involvement between the state and the schools. Such involvement, however, does not constitute excessive entanglement violative of the First Amendment. As the United States Supreme Court has noted, it has never been thought either possible or desirable to enforce a regime of total separation between church and state; thus, the high wall of separation in modern interpretation has become "a blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship." *Lemon v. Kurtzman*, 403 U.S. 602, 614, 91 S.Ct. 2105, 2112, 29 L.Ed.2d 745, 756 (1971).

It is clear from decisions of the Supreme Court that programs which require constant state surveillance or supervision to police the provisions of state programs or that single out church-related schools for preferential treatment will not be tolerated. *Wolman v. Walter*, 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977); *Tilton v. Richardson*, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971); *Walz v. Tax Commission*, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970); *Everson v. Board of Education*, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947). Any entanglement between church and state in the present case does not reach the level of that which was struck down in *Lemon v. Kurtzman*, supra. In that case, state statutes provided state reimbursement to non-public elementary and secondary schools for the cost of teachers' salaries, textbooks and instructional materials. Under one statute, participating schools were required to identify the cost of secular educational service by prescribed accounting procedures that were subject to state audit. The other statute provided annual salary supplements to teachers of secular subjects in non-public elementary schools. The teachers were required to sign a written statement agreeing not to teach religious courses while receiving salary supplements, and were required to teach only subjects taught in public schools, using the same materials. Such statutes were found to create excessive entanglement because comprehensive and continuing state surveillance would be required to insure that the programs' provisions were obeyed. In the present case, respondents contend that because different benefits accrue to those employees that are laid off and those that are fired, the state will necessarily become involved in questions of doctrinal interpretation. Such is not the case. The teachers in respondents' schools are not under contract; rather, they receive a "call" from the church and there are only two ways that a teacher may be released from that call. One is by teaching false doctrine and the other is by misconduct as outlined by respondents' own standards. In both cases, the rules relating to dismissal are regulated

by internal doctrinal matters controlled by the church. The state, therefore, need only determine whether the employee was fired or laid off. The employee, as before, will be left to the mercy of respondents' personnel practices.

Respondents also rely on *National Labor Relations Board v. Catholic Bishop of Chicago*, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979). The issue in that case was whether an NLRB attempt to exercise jurisdiction over diocesan schools to determine whether a particular personnel practice constituted an unfair labor practice fostered excessive entanglement between church and state. The Seventh Circuit United States Court of Appeals held in the affirmative. The Supreme Court stated that the resolution of such a question "in many instances, [would] necessarily involve inquiry into the good faith of the position asserted by the clergy-administrators and its relationship to the school's religious mission" and thus create excessive entanglement. 99 S.Ct. at 1320. While noting the risks of entanglement inherent in such a relationship, however, the Court declined to decide the First Amendment question in the absence of a clear expression of an affirmative intention of Congress to bring teachers and employees in church-related schools within NLRB jurisdiction. The majority's extended discussion of the entanglement question nonetheless suggests that had such congressional intent been found to exist, serious issues of constitutional magnitude would arise. The minimal entanglement that might result in the present case, however, does not approach the potential effect, noted in *Catholic Bishop*, of mandatory collective bargaining on the ability of clerical authorities to administer their schools. In no case would the state be required to actually adjudicate employer/employee disputes in a sectarian school setting. Unemployment insurance coverage does not necessitate state involvement in the development of curriculum, faculty standards, working conditions or any other aspect of school operations. The unemployment insurance system would generally come into play only after an employee had been terminated and

was no longer connected in any way with the particular school. Further, the financial impact of the unemployment insurance compensation law cannot be compared with the financial ramifications of NLRB jurisdiction over diocesan schools. In the case of the NLRB, there exists power to order reinstatement with back pay and to utilize judicial authority to enforce its ruling. The state has no such power in the present case. We also note that the simple determination of the amount of time spent by employees working in respondents' schools, as opposed to its churches, does not foster entanglement of constitutional dimensions.

## IV

■ Finally, respondents contend that female teachers are exempt from coverage as members of a religious order under SDCL 61–1–10.4(2). Respondents argue that such teachers cannot be denied exempt status, because the Synod dogmatically considers its female teachers to be part of its Christian ministry. The fact, however, is that female teachers in respondents' schools are not permitted to perform any sacerdotal duties or to vote on Synod matters; rather, they are allowed to perform only those functions normally associated with basic education. Thus, their coverage under the unemployment compensation law is appropriate.

The judgment of the circuit court is reversed and the case is remanded with directions to reinstate the decision of the Appeals Referee.

WOLLMAN, C. J., and DUNN and MORGAN, JJ., concur.

HENDERSON, J., dissents.

HENDERSON, Justice (dissenting).

I respectfully dissent.

The object and purpose of the Wisconsin Evangelical Lutheran Synod, as set forth in its constitution, is to "extend and conserve the true doctrine and practice of the Evangelical Lutheran Church." One method of achieving this is by "establishing and main-

taining theological seminaries, colleges, academies, schools, and other institutions." The Synod believes a theological basis exists for its schools. It holds the conviction that training of the youth involves both education and religion and the two are so closely interwoven that they cannot be separated. They operate school programs in accordance with their beliefs.

The Synod has 1105 churches of which 330 operate elementary Christian day schools. St. Martin's Evangelical Lutheran School, appellee, is one of these 330 elementary schools. The Synod also maintains two types of secondary schools: (1) Area high schools, designed to provide a Christian education to students at this level, and (2) Academies, structured to provide secondary education for individuals planning to enter the preaching or teaching ministry of the Church. Northwestern Lutheran Academy, appellee, is one of four such academies maintained by the Synod. The Synod has both teaching and preaching ministers. These ministers and teachers receive similar religious training; both receive, they sincerely believe, a divine, life-long call to serve their church and God. The Synod considers the female teachers to be part of the ministry and they have responsibilities equal to that of the male teachers. Courses offered at the school and at the academy are taught from a religious viewpoint based upon scriptural convictions held by members of the Wisconsin Evangelical Lutheran Synod. The school is financed 100% by the local congregation. The Synod owns, operates, and finances the academy.

Both the school and the academy are exempt from income taxation under Section 501(c)(3) of the Internal Revenue Code. In the past, they have also been exempted from Federal Unemployment Tax Act (FUTA) coverage by SDCL 61–1–10.4(3), which corresponds to 26 U.S.C. Section 3309(b)(3). SDCL 61–1–10.4, until recently, provided in pertinent part:

> 61–1–10.4 EXEMPT EMPLOYMENT BY CHURCHES, INSTITUTIONS AND STATES.—[f]or the purposes of Sections 61–1–10.2 and 61–1–10.3 the term "employment" does not apply to service performed:
>
> (1) In the employ of
>
> (a) a church or convention or association of churches, or
>
> (b) an organization which is operated primarily for religious purposes and which is operated, supervised, controlled, *or primarily supported by a church or convention or association of churches* (emphasis supplied); or
>
> (2) By a duly ordained, commissioned, or licensed minister of a church in the exercise of his ministry or by a member of a religious order in the exercise of duties required by such order; or
>
> (3) In the employ of a school other than a state school which is not an institution of higher education prior to January 1, 1978.

The Unemployment Compensation Amendments Act of 1975, P.L. 94–566, 90 Stat. 2667, removed the subsection (3) exemption. Memoranda were thereupon sent to state employment security agencies by the U.S. Department of Labor, directing that all "church-related nonprofit elementary and secondary schools" be required to participate in the program. I am not bound by the interpretation of a bureaucrat in a government agency in Washington, D.C.

At a hearing conducted by the Field Service of the South Dakota Department of Labor, Unemployment Insurance Division, it was held that both schools were employers subject to S.D. unemployment insurance laws. Neither am I bound by a state employee's interpretation of congressional action. That determination was appealed and a hearing was held on July 19, 1978, before a Labor Department appeals referee. In his decision, entered September 15, 1978, the referee affirmed the initial determination that the schools were employers subject to coverage. To put it another way, each echelon of bureaucracy within the Department of Labor upheld itself. The circuit court, on appeal, reversed the referee upon the basis that the decision was affected by error of law in a misapplication of law and clearly erroneous in light of the entire evi-

dence in the record. I would affirm the circuit court.

Counsel for appellees contend that they are exempt under SDCL 61–1–10.4 because of their relationship to a church. The state maintains that the repeal of the subsection (3) exemption for non-public schools was aimed at church schools as well as secular schools. The appeals referee concluded that a "church," as used in the statute, was synonymous with a "house of worship" rather than an organization of worshippers. This interpretation is most untenable when noting the context in which "church" is used. SDCL 61–1–10.4(1)(a) speaks of services performed in the employ of a church. If the term "church" in isolation is ambiguous, the context of this statute absolutely forecloses equation with a physical plant. Clear error was committed when the appeals referee defined the term in such a manner as to make the statute absurd and ineffectual under any circumstance. When subsection (3), relating to private school coverage was repealed, Congress had a perfect opportunity to modify or remove the church-related exclusions. That was not done. The fact that the definition of church embodies an organization, rather than an edifice, strongly indicates that SDCL 61–1–10.4(1) exemptions remain valid and useful. In 1954, the question of defining the term "church" arose before the U.S. Senate. The Senate Finance Committee in its report observed:

Your committee understands that 'church' to some denominations includes religious orders as well as other organizations which as integral parts of the church are engaged in carrying out the functions of the church *whether as separate corporations or otherwise. It is believed the term church should be all inclusive.* (Senate Report No. 1622, 83rd Congress, 2nd Session, page 30) (emphasis added)

In 1955, the staff of the Joint Conference Committee published its explanation of the Internal Revenue Code of 1954, entitled, "Summary of the Provisions of the Internal Revenue Code of 1954 (H.R. 8300) as Agreed to by the Conferees." On page 19 the staff explained:

The term church is intended to include religious orders as well as other organizations which, as integral parts of the church, are engaged in carrying out the functions of the church, whether as separate corporations or otherwise.

With respect to FUTA, the legislative history gives no support whatever to a narrower definition of the term "church" other than being all inclusive and including integral parts of the church, such as the parochial school. Congress, when passing FUTA amendments, clearly understood its interpretation of the word "church."

The question thus becomes whether either or both of the schools fall within the subsection (1) exemptions. St. Martin's Evangelical Church School is not a separate entity of St. Martin's Evangelical Church. Appellants are attempting to cleave the school from the church and this cannot be done. The appeals referee found that while the school was state certified the school was supervised by a board of education elected from and by the local congregation. South Dakota requires accreditation of any school serving children under the age of sixteen in lieu of attending public schools. Inasmuch as religious schools must be state certified, this state requirement should not be the basis for labeling them strictly educational. Finance and supervision provide the critical nexus between church and school, which places the latter squarely within the SDCL 61–1–10.4(1)(b) exemption for services performed in the employ of an organization. The school is operated primarily for religious purposes and is operated, supervised, controlled or principally supported by the church. This is the heart of my dissent. The congregation of St. Martin's Church supports public schools, located within a reasonable proximity, through the payment of taxes; the only rational reason that it would bear the additional burden of operating and financing a private school would be for religious purposes. A clear error was committed by the appeals referee in concluding that the primary purpose of the school was not religious.

Northwestern Lutheran Academy's teaching faculty comes 50% from the teaching ministry and 50% from the preaching ministry. Of the students at the academy, 46% go on to become teachers or pastors. The academy's remaining 54% nevertheless receive courses of instruction with religious overtones. Again, it must be recognized that public secondary schools exist in reasonable proximity and are supported by taxes paid by members of the Synod. It is obvious that these members send their children to a school which embraces their religious beliefs and where their children will be taught Christian values. The academy exists only for church purposes. The fact that the state imposes state certification does not change the character of the academy which is to propagate the faith of the Synod, and it is manifestly wrong for a state agency to subordinate that mission.

Any attempt to subject appellees, who are religious organizations operating religious schools, to an unemployment compensation law would be an impermissible entanglement between the church and state contrary to the First Amendment to the Constitution of the United States and Article VI, Section 3 of the South Dakota Constitution which provides for freedom of religion. The First Amendment provides in part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."

Under the unemployment compensation law, an employee who is laid off from work is entitled to unemployment compensation benefits, but an employee discharged for misconduct may be denied benefits. The majority opinion alludes to the fact that the only two ways a teacher may be released for cause is by teaching false doctrine and by misconduct as outlined by appellee's own standards. It concludes that since rules relating to dismissal are regulated by internal doctrinal standards controlled by the church, there would only be minimal entanglement because the state has only to determine whether the employee was fired or laid off. This matter of potential entanglement cannot be so cursorily treated. Let us hypothesize that the Synod discharged an employee citing the reason as teaching contrary to school doctrine or misconduct, but the employee contends that the real reason for the discharge was due to budgetary concerns, and therefore, he or she was merely laid off. This employee could request a hearing to determine if he or she was entitled to full benefits. Granted, while the entanglement would not reach the proportions as that found in *N.L.R.B. v. Catholic Bishop of Chicago*, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979), such a hearing would nonetheless involve the question of whether the teacher did or did not teach contrary to Synod doctrine or on what basis, according to doctrinal standards, the employee's action constituted misconduct. The hearing examiner would have to rule on these matters of religious belief and misconduct, which is the kind of entanglement prohibited by the First Amendment to the Constitution.

The power to tax, surveil, and supervise this program is the power to destroy parochial schools. This program is another insidious spoke in the web of entanglement which chokes the free spirit of religious schools and their ability to function in their dedication to God. If religious schools are mandated into state and federal programs which exact money from them at governmental statutory whim, they shall die. They cannot coexist with governmental interference and over-lay. Our forefathers fled to these shores that they might worship as they please and to raise their children in their own religious faith. I do not believe in a system of government, congressional acts, state statutes, or legal interpretations by the judiciary that would destroy that dream. The Constitution is a bulwark against state invasion of religiously based schools. In it, I abide.

I do not believe that Congress intended the tax to be applicable to the services of church operations run directly by the church with its own employees. For a persuasive case in point, with the same basic issues and statutes and a result contrary to the majority opinion, see *The Lutheran Church, Missouri Synod, et al. v. State of*

*California Employment Development Department, et al.,* (Case No. CV79–0162–MRP before the United States District Court, Division of California, Opinion rendered September 21, 1979).