Marquelle **MILLER**, by his next friend, Cynthia Miller; Cynthia Miller; Angela Gray, by her next friend, Zachery Gray; Zachery Gray; Shon Richardson, by his next friend, George Richardson; George Richardson; Latrisha Henry, by her next friend, Faye Henry; Faye Henry; Reigne Barrett, by her next friend, Valerie Barrett; and Valerie Barrett, Plaintiffs,

v.

John T. **BENSON**, Superintendent of Public Instruction, Defendant.

Civ.A. No. 93–C–1063.

United States District Court, E.D. Wisconsin.

March 14, 1995.

---

Landmark Legal Foundation, Mark J. Bredemeier, Kansas City, MO, Landmark Center for Civil Rights, Mark R. Levin, Washington, DC, for plaintiffs.

Warren D. Weinstein, Asst. Atty. Gen., Madison, WI, for defendant.

Amici brief filed by ACLU of Wisconsin Foundation, Inc., Milwaukee Jewish Council for Community Relations, Inc., and Wisconsin Jewish Conference.

**DECISION AND ORDER DENYING SUMMARY JUDGMENT FOR PLAINTIFFS, GRANTING SUMMARY JUDGMENT FOR DEFENDANT, AND FINDING THE CURRENT SCHOOL CHOICE PROGRAM CONSTITUTIONAL UNDER THE FIRST AMENDMENT**

REYNOLDS, Senior District Judge.

The question before the court is whether Wisconsin's current "Milwaukee School Choice Program" ("Choice Program"), which reimburses private *nonreligious* schools for the tuition of eligible children, must also reimburse private *religious* schools for the tuition of similarly situated children. The answer is no.[1]

The court has jurisdiction over this action pursuant to the United States Code, 28 U.S.C. §§ 1331 and 1343.

## I. THE FACTS OF THIS CASE

In their cross motions for summary judgment, the parties agreed to the following facts:

### A. The Wisconsin Choice Program

In the spring of 1990, the Wisconsin legislature passed and the Governor signed the law creating the Choice Program. Wis.Stat. Ann. § 119.23 (West 1991 & Supp.1994) (enacted 1990 & amended 1993). As amended in 1993, the law provides that "any pupil in grades kindergarten to 12 who resides within the city [of Milwaukee] may attend, at no charge, any *nonsectarian* [nonreligious] private school located in the city," so long as the student, the student's family, and the private school meet certain requirements. *Id.* § 119.23(2)(a) (emphasis added). To take part in the Program, a student's family income cannot exceed 1.75 times the poverty level determined under federal law. *Id.* § 119.23(2)(a)1. Seats in the Choice pro-

---

1. The Wisconsin Supreme Court has also upheld the Choice Program under the constitution of the State of Wisconsin. On March 3, 1992, in *Davis, et al. v. Grover,* 166 Wis.2d 501, 480 N.W.2d 460, the Wisconsin Supreme Court upheld the School Choice Program against a challenge based upon Wisconsin's constitutional prohibition against private or local bills, establishment of uniform school districts, and the public purpose doctrine. *See* Wis. Const. art. IV, § 18 & art. X, § 3. The free exercise and establishment of religion issues raised in the present case were not raised in *Davis.*

gram are limited to 1.5% of the school district's membership,[2] and no more than 65% of a participating private school's enrollment may consist of pupils attending that school under the Choice Program.[3] *Id.* § 119.23(2)(b). Religious schools cannot participate in the Program. *Id.* § 119.23(2)(a).

Under the Choice Program, nonreligious private schools notify the State Superintendent of their intent to participate,[4] and parents of pupils wishing to take advantage of the Program submit applications, on forms provided by the State Superintendent, directly to participating private schools. *Id.* § 229.23(2). Participating schools must select Choice Program pupils on a random basis. *Id.* § 119.23(3). Once accepted, a pupil's parent or guardian must submit proof of the pupil's enrollment in a participating private school to the State Superintendent. Upon such proof, the Superintendent pays tuition directly to the private school in an amount calculated based on the amount of state aid provided to the Milwaukee Public School system per pupil.[5] The Wisconsin Legislature appropriates the funds which flow directly from the state treasury to the private school in four installments. *Id.* § 119.23(4).

Both the State Superintendent and the Wisconsin Legislative Audit Bureau have oversight and reporting duties under the statute. The State Superintendent must prepare a report for the State Legislature and for participating schools which compares Choice Program students to Milwaukee Public School students in areas of academic achievement, daily attendance, dropouts rates, suspension and expulsion rates, and parental involvement activities. *Id.* § 119.23(5)(d) The State Superintendent may prohibit a school's future participation in the program if it does not meet certain criteria. *Id.* § 119.23(7)(a) & (b). Those school criteria are:

1. At least 70% of the pupils in the program advance one grade level each year.

2. The private school's average attendance rate for the pupils in the program is at least 90%.

3. At least 80% of the pupils in the program demonstrate significant academic progress.

4. At least 70% of the families of pupils in the program meet parent involvement criteria established by the private school.

*Id.* § 119.23(7)(a). Additionally, the Legislative Audit Bureau must perform a financial and performance evaluation of the Program. *Id.* § 119.23(9)(b).

Participation in the Choice Program has increased each year. There are currently 23 private, nonreligious schools within the boundaries of the Milwaukee Public School district. Seven of those schools and more than 300 students launched the Program's inaugural 1990–91 school year. The following year, enrollment increased to 521 Choice Program students at six schools. In its third year, more than 600 students and eleven private schools participated in the Program, and the numbers increased to 733 students and twelve private schools in the fourth year. For this 1994–95 school year, the Superintendent has accepted 879 pupils and twelve private schools to participate in the Program. Slightly more than 100 available Choice Program student spots were expected to be left vacant this year.

## B. The Plaintiffs

The plaintiffs are five low-income schoolchildren and their parents, all of whom reside in the Milwaukee Public School district. Each meets the criteria for participation in the random selection process of the Choice Program. However, the children's parents

---

**2.** The 1990 version of the law capped the number of children who could participate at 1% of the school district's membership. *Id.* § 119.23(2)(b)(1) (1990).

**3.** The 1990 version of the law allowed only 49% of a private school's enrollment to consist of Choice Program participants. *Id.* § 119.23(2)(b)(2).

**4.** The school must meet health and safety laws and comply with the prohibitions of discrimination found in 42 U.S.C. § 2000(d). *Id.* § 119.23(2)(a)4 & 5.

**5.** For the 1994–95 school year, the amount was estimated to be $3,245 per pupil.

would prefer that their children attend otherwise qualified private *religious* schools rather than the private nonreligious schools eligible under the Program.

## II. ANALYSIS AND APPLICATION OF THE LAW

The parties have agreed that there are no material factual disputes and that this case is ripe for a decision on the law.[6]

The plaintiffs claim that the Program's exclusion of religious schools denies them equal access to an available government benefit based upon their religious beliefs, and thus deprives them of their right to the free exercise of religion in violation of the First Amendment, and of equal protection of the laws in violation of the Fourteenth Amendment of the United States Constitution.[7] The plaintiffs ask the court to declare the Choice Program unconstitutional, and to permanently enjoin the enforcement of the prohibition against religious private school participation. They would also have the court order the State Superintendent and other state officials to solicit applications for participation in the Program from otherwise qualified private religious schools, and to allow the enrollment of eligible pupils in private religious schools under the Program.

The State Superintendent counters that the plaintiffs do not have standing to assert their claims, that the Choice Program does not infringe upon the plaintiffs' free exercise of religion rights, and that even if it does infringe on free exercise, there is a compelling justification for treating religious schools differently than nonreligious schools because opening up the Choice Program to private religious schools would violate the Establishment Clause. Therefore, he argues, the Program is constitutional.[8]

### A. Standing

■ To satisfy constitutional standing requirements the plaintiffs, parents and children, must allege "personal injury fairly traceable to the [Superintendent's] challenged conduct and likely to be redressed by the requested relief." *Fleischfresser v. Directors of Sch. Dist. 200,* 15 F.3d 680, 683 (7th Cir.1994) (quoting *Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)). Because the parents in this action have alleged that they are unable to participate in the Choice Program in a manner which comports with their right to direct their children's religious training, they have asserted a direct and personal injury. *See Fleischfresser,* 15 F.3d at 684 (parents have standing to assert their direct, personal right to control the religious upbringing and training of their minor children); *see also Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *American Civil Liberties Union v. St. Charles,* 794 F.2d 265, 269 (7th Cir.) *cert. denied,* 479 U.S. 961, 107 S.Ct. 458, 93 L.Ed.2d 403 (1986); *cf. Berger v. Rensselaer Cent. Sch. Corp.,* 982 F.2d 1160, 1164 n. 4 (7th Cir.) *cert. denied,* ── U.S. ──, 113 S.Ct. 2344, 124 L.Ed.2d 254 (1993). Neither the children nor the parents in this action have any opportunity to choose religious education funded by the Choice Program. Their requested relief would allow them the chance to do so. Thus, the plaintiffs have standing to raise this challenge against the Choice Program exclusion.

### B. The Free Exercise Clause and the Establishment Clause

There are three clauses of the United States Constitution and several Supreme Court cases interpreting those clauses which the court looks to for guidance in this case. Two of the constitutional clauses are found in

---

**6.** The court must grant a motion for summary judgment if the pleadings, depositions, answers to interrogatories, admissions, and affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c).

**7.** Originally, the plaintiffs pursued a claim under the Religious Freedom Restoration Act of 1993,

42 U.S.C. 2000bb (Supp.1994) (*Id.* ¶¶ 32–37), but they dropped that claim in oral argument.

**8.** The only issue before the court is whether the present Program in Wisconsin is unconstitutional *because it excludes private religious schools.* The court assumes, without deciding, that the Program is constitutional in all other ways. This decision is limited to the constitutionality of the current Choice Program.

the First Amendment, which declares, in part: **"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."** U.S. Const. amend. I. The clause forbidding laws which establish religion (the "Establishment Clause") and the clause forbidding laws which prohibit the free exercise of religion (the "Free Exercise Clause") apply to state lawmakers through the third important constitutional provision in this matter, the Fourteenth Amendment, which requires that people within a state receive equal protection of the laws of that state.[9] *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940).

The crux of the plaintiffs' claim is that although the State of Wisconsin had no legal obligation to bestow a government benefit providing for funding of private schools that educate children from low-income families who choose to attend those private schools, once it did so the state could not exclude similar benefits to private religious schools with similarly situated children. The Constitution protects parents' rights to direct the education of their children, to choose private education over public education, and to choose religious schools over nonreligious schools. *See, e.g., Committee for Public Educ. & Religious Liberty v. Nyquist,* 413 U.S. 756, 788, 93 S.Ct. 2955, 2973, 37 L.Ed.2d 948 (1973) (recognizing that a state cannot prevent a parent from educating child in religious school); *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (state cannot require members of Amish Church to send children to public school after eighth grade); *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) (state cannot require that children attend public schools rather than private schools). Moreover, the Supreme Court has

strictly scrutinized laws which impinge upon religious freedoms when another constitutional right, such as the right to direct one's child's education, is also implicated. *See Employment Division v. Smith,* 494 U.S. 872, 881, 110 S.Ct. 1595, 1601, 108 L.Ed.2d 876 (1989).

However, as the Supreme Court has repeatedly stated, tension between the Free Exercise Clause and the Establishment Clause is inevitable, and "it may not be possible to promote the former without offending the latter." *Nyquist,* 413 U.S. at 788, 93 S.Ct. at 2973. The Supreme Court's cases interpreting the First Amendment religion clauses in the area of economic benefits to religious schools draw fine lines between what a state may or must do, and what a state may not do. These lines arguably may not be logical or rational, but they represent the best efforts of the Court to resolve these most difficult problems.

For example, under the First Amendment religion clauses, **the United States Supreme Court has *approved* of the following state benefits programs:**

● 1947: school boards may reimburse parents for the transportation of children attending religious schools;[10]

● 1968: state may require local public school authorities to lend nonreligious textbooks free of charge to all students in grades seven to 12, including those in religious schools;[11]

● 1971: federal government may provide construction grants to religious-related colleges and universities to construct facilities used for nonreligious purposes;[12]

● 1977: state may provide religious school students with books, standardized testing

9. The Fourteenth Amendment provides, in part: No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

10. *Everson v. Board of Education,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947).

11. *Board of Education v. Allen,* 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968).

12. *Tilton v. Richardson,* 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971); *see also Hunt v. McNair,* 413 U.S. 734, 93 S.Ct. 2868, 37 L.Ed.2d 923 (1973) (state aid, rather than federal aid).

and scoring, hearing and speech diagnostic testing;[13]

● 1983: state may allow tax deductions for tuition, textbooks, and transportation expenses for parents of all schoolchildren, including children attending religious schools;[14]

● 1986: state may finance a blind student's training at a Christian college under a state vocational rehabilitation program;[15]

● 1993: school district must provide, pursuant to the Individuals with Disabilities Education Act, a sign-language interpreter to accompany a deaf child to classes at a Catholic high school.[16]

Applying the same constitutional rights, **the United States has *disapproved* of the following state benefits programs:**

● 1971: state may not supplement religious school teacher salaries or reimburse religious schools for teacher salaries, even if the supplements and reimbursements are for teaching in areas that the state determines to be nonreligious;[17]

● **1973: state may not offer unrestricted direct money grants for maintenance and repairs to religious schools,[18] unrestricted partial tuition grants to parents of low-income pupils attending religious private schools,[19] or income tax benefits directed exclusively to parents of children attending private schools (religious and nonreligious);[20]**

● 1975: state may not provide remedial teaching and counseling services on religious school grounds, or loan instructional materials and equipment to religious schools;[21]

● 1977: public school districts may not provide transportation for religious school field trips;[22]

● 1977: state may not loan instructional equipment to children attending religious schools or to their parents;[23]

● 1985: state may not use federal funds to pay the salaries of public school employees who teach in religious schools in low-income areas.[24]

The most important information to be garnered from this list is that in 1973, the Supreme Court found that unrestricted payments flowing directly to religious schools violated the Establishment Clause, and that tuition reimbursement grants flowing to parents of low-income children attending religious schools also violated the Establishment Clause. *Nyquist*, 413 U.S. 756, 93 S.Ct. 2955. The State of New York had created a program to help defray costs of educating low-income children in private religious schools. One portion of the program provided religious schools in low-income areas with direct grants for maintenance and repair without restricting the use of the funds to nonreligious-related facilities. The Supreme Court struck down this provision because it failed to limit the flow of money to nonreligious facilities, and because its inevitable effect was to directly subsidize religion. *Id.* at 779–80, 93 S.Ct. at 2968–69.

13. *Wolman v. Walter*, 433 U.S. 229, 241–42, 97 S.Ct. 2593, 2601–02, 53 L.Ed.2d 714 (1977).

14. *Mueller v. Allen*, 463 U.S. 388, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983).

15. *Witters v. Washington Dept. of Services for the Blind*, 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986).

16. *Zobrest v. Catalina Foothills Sch. Dist.*, —— U.S. ——, 113 S.Ct. 2462, 125 L.Ed.2d 1 (1993).

17. *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).

18. *Committee for Public Education & Religious Liberty v. Nyquist*, 413 U.S. 756, 774–780, 93 S.Ct. 2955, 2966–69, 37 L.Ed.2d 948 (1973).

19. *Id.* at 780–89, 93 S.Ct. at 2969–74.

20. *Id.* at 789–94, 93 S.Ct. at 2973–76.

21. *Meek v. Pittenger*, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975).

22. *Wolman*, 433 U.S. at 254, 97 S.Ct. at 2608–09.

23. *Id.* at 250–51, 97 S.Ct. at 2606–07.

24. *Aguilar v. Felton*, 473 U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985); *see also School Dist. of Grand Rapids v. Ball*, 473 U.S. 373, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985).

The second portion of New York's school benefits program in *Nyquist* involved tuition reimbursement grants which the state gave to low-income parents of private schoolchildren (including those who attended religious schools) as partial reimbursement for their children's tuition. The Court announced:

> **There can be no question that these [tuition] grants could not, consistently with the Establishment Clause, be given directly to sectarian [religious] schools,** since they would suffer from the same deficiency that renders invalid the grants for maintenance and repair. In the absence of an effective means of guaranteeing that the state aid derived from public funds will be used exclusively for secular, neutral, and nonideological purposes, it is clear from our cases that direct aid [to religious schools] in whatever form is invalid.

*Id.* at 780, 93 S.Ct. at 2969 (emphasis added). Furthermore, the Court decided that the fact that New York's tuition grants flowed directly to parents rather than to schools was "only one among many factors to be considered," and did not make the program constitutional, for New York had not endeavored to ensure that the economic benefits would be used solely for nonreligious educational functions. *Id.* at 781, 783, 93 S.Ct. at 2970, 2971. In rejecting New York's argument that the program was designed to promote the free exercise of religion for low-income parents and their children, the Court noted the tension between the Free Exercise Clause and the Establishment Clause, and explained:

> [O]ur cases require the State to maintain an attitude of "neutrality," neither "advancing" nor "inhibiting" religion. In its attempt to enhance the opportunities of the poor to choose between public and nonpublic education, the State has taken a step which can only be regarded as one "advancing" religion. However great our sympathy, for the burdens experienced by those who must pay public school taxes at the same time that they support other schools because of the constraints of "conscience and discipline," and notwithstanding the "high social importance" of the State's purposes, neither may justify an

eroding of the limitations of the Establishment Clause now firmly emplanted.

*Id.* at 788–89, 93 S.Ct. at 2973–74 (footnote and citations omitted).

No case has overruled *Nyquist*'s prohibition on tuition grants and unrestricted direct subsidies to religious schools. In a 1982 case in which the Supreme Court permitted Minnesota to allow tax deductions to parents for the expenses of their children's public or private, religious or nonreligious education, the Supreme Court carefully noted the enduring principle of *Nyquist* in the following manner:

> [T]his case is vitally different from the scheme struck down in *Nyquist.* There, public assistance amounting to tuition grants was provided only to parents of children in *nonpublic* schools. This fact had considerable bearing on our decision striking down the New York statute at issue.... Unlike the assistance at issue in *Nyquist,* [the Minnesota tax deduction] permits *all* parents—whether their children attend public school or private—to deduct their children's educational expenses. As ... our other decisions indicate, a program, like [the Minnesota tax deduction] that neutrally provides state assistance to a broad spectrum of citizens is not readily subject to challenge under the Establishment Clause.

*Mueller v. Allen,* 463 U.S. 388, 398–99, 103 S.Ct. 3062, 3068–69, 77 L.Ed.2d 721 (1983). The *Mueller* Court also found it important that the economic benefit of Minnesota's tax deduction flowed directly to the parents and not to the schools because such an arrangement helped avoid the appearance of an "'imprimatur of state approval' ... conferred on any particular religion, or on religion generally." *Id.* at 399, 103 S.Ct. at 3069. (citation omitted).

 Like New York's tuition reimbursement program in *Nyquist,* Wisconsin's current Choice Program helps low-income children go to private schools. Unlike New York's program, however, Wisconsin's Choice Program avoids an Establishment Clause violation because it only pays for tuition at nonreligious private schools. Although the tuition and tax deduction benefits in *Nyquist*

and *Mueller* flowed directly to the parents, both of those cases advanced the principle that when an economic benefit flows directly to private religious schools, it gives rise to a likely Establishment Clause violation. *Id.*

The plaintiffs have argued that the present state of Establishment Clause jurisprudence is in flux,[25] and that the current Supreme Court might be more likely to allow a tuition reimbursement program flowing to religious private schools. The plaintiffs have even suggested that the current Supreme Court would overrule *Nyquist*. However, this court may not speculate on future decisions of the current Supreme Court and decide a case on such speculation when a directly relevant Supreme Court case decides the issue. The present state of First Amendment law compels this court to hold that the plaintiffs' request to expand the current Choice Program to make tuition reimbursements directly payable to religious private schools who admit eligible Choice Program schoolchildren would violate the Establishment Clause. The current Program is constitutional. Therefore, the plaintiffs' motion for summary judgment shall be denied, the defendant's motion for summary judgment granted, and this case dismissed.

For all of the foregoing reasons:

**IT IS ORDERED** that the plaintiffs' motion for summary judgment is DENIED; and

**IT IS ORDERED** that the defendant's motion for summary judgment is GRANTED, and this case is DISMISSED.

---

**25.** In recent cases, for instance, the Supreme Court has moved away from using its decades-old and much maligned three-part test set out in *Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111–12, 29 L.Ed.2d 745 (1971) (statute or practice affecting religion is only permissible if it has secular purpose, neither advances nor inhibits religion as principal or primary effect, *and* does not foster excessive entanglement with religion). *See Board of Education of Kiryas Joel v. Grumet*, —— U.S. ——, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994) (Court resolved Establishment Clause issues without reference to *Lemon* test); *Lee v. Weisman*, —— U.S. ——, ——, 112 S.Ct. 2649, 2655, 120 L.Ed.2d 467 (1992) (same).