The STATE ex rel. STATE TEACHERS RETIREMENT BOARD, Appellant,

v.

WEST GEAUGA LOCAL SCHOOL DISTRICT BOARD OF EDUCATION
et al., Appellees;  GAETANO et al., Appellants.

[Cite as *State ex rel State Teachers Retirement Bd. v. W. Geauga
Local School Dist. Bd. of Edn.* (1998), 131 Ohio App.3d 150.]

Court of Appeals of Ohio,
Eleventh District, Geauga County.

Nos. 97-G-2066 and 97-G-2067.

Decided Oct. 1, 1998.

*Betty D. Montgomery*, Attorney General, and *Michael W. Gleespen*, Assistant Attorney General, for appellant State Teachers Retirement Board.

*David P. Joyce*, Geauga County Prosecuting Attorney, and *Donald B. Bagley III*, Assistant Prosecuting Attorney, for appellee West Geauga Local School District Board of Education.

*Jack D. Maistros*, for appellants Mary Ann Gaetano and Catherine A. Miller.

*Gregory J. Viviani*, for appellee Hawken School.

---

CHRISTLEY, Judge.

This appeal is taken from a final judgment of the Geauga County Court of Common Pleas. Appellants challenge the decision of the trial court denying them the issuance of a writ of mandamus and declaratory judgment.

This cause of action arose from the following set of facts.[1] The West Geauga Local School District ("West Geauga") is a public school district organized pursuant to R.C. Title 33. Hawken School ("Hawken") is a nonprofit corporation organized under R.C. Chapter 1702. Hawken operates a private, nonsectarian

---

1. The parties to this lawsuit agreed to submit stipulations of facts and attached exhibits to the trial court in lieu of having an evidentiary proceeding. Consequently, our factual description of this litigation is based on the set of stipulated facts as submitted by the parties.

high school within the geographical boundaries of West Geauga. Pursuant to R.C. 3317.024(P), West Geauga receives auxiliary services funds from the state to be used for the benefit of students "attending a chartered nonpublic elementary or high school within the district." For purposes of the statute, Hawken is such a nonpublic, chartered high school located within the West Geauga school district.

During the 1981 through 1988 academic years, Mary Ann Gaetano ("Gaetano") rendered diagnostic and remedial reading services to the pupils attending Hawken. In a similar fashion, Catherine Anne Miller ("Miller") provided remedial reading and study skills services at Hawken from the 1983 through 1988 school years. At all pertinent times while teaching at Hawken, Miller maintained a teaching certificate issued by the Ohio Department of Education. Gaetano, however, did not have such a certificate, even though she met the requirements for obtaining certification.

The parties stipulated that the teaching services provided by Gaetano and Miller were performed exclusively on the grounds of Hawken and not at any facility operated or controlled by West Geauga. Moreover, neither Gaetano nor Miller ever reported to any representative of West Geauga with respect to the performance of her teaching duties at Hawken.

West Geauga paid Gaetano and Miller directly during the years that the women taught at Hawken. West Geauga used only auxiliary services funds to pay Gaetano and Miller. As such, the payments represented an expenditure of auxiliary service monies allocated to West Geauga pursuant to R.C. 3317.024(P) for the provision of remedial services to pupils attending a nonpublic school within the West Geauga school district as authorized by R.C. 3317.06(G).

From the 1981 through 1984 school years, Hawken submitted purchase orders to West Geauga reflecting the number of hours worked by Gaetano and Miller. The purchase orders were signed by Fred Hoffman, the associate headmaster of Hawken. The treasurer of West Geauga reviewed the purchase orders and certified the availability of auxiliary services funds to pay the amounts due to the women. The West Geauga Board of Education then passed a board resolution approving the payment of such funds by check.

During the 1985 through 1988 academic terms, the agreements for services rendered by Gaetano and Miller were prepared by Hawken on its school letterhead. These agreements were then forwarded to West Geauga for payment directly to the two women from auxiliary services funds after certification by the treasurer of the availability of such funds.

The treasurer recorded these payments as services purchased in a nonpublic school by individuals who were not employed by West Geauga. Consequently, West Geauga never withheld any federal, state, or local income taxes from the

payments made to Gaetano and Miller. For the same reason, the public school district did not issue an Internal Revenue Service Form W–2 to the women.

Because West Geauga did not view Gaetano and Miller as its employees, the school district did not submit either employer or employee contributions to the State Teachers Retirement System ("STRS") on behalf of the women for the work they performed at Hawken from the 1981 through 1988 school years. However, according to the facts as stipulated by the parties, if Gaetano and Miller testified at an evidentiary hearing, they would have indicated that they asked Hoffman to withhold STRS contributions from their paychecks. By contrast, Hoffman would have testified that neither teacher ever made such a request.

In 1992, both Gaetano and Miller contacted the State Teachers Retirement Board ("STRB") in order to inquire into possible retirement benefits owed to them by STRS. In a letter to West Geauga, dated November 13, 1992, STRB commenced efforts to recoup the payment of employer and employee contributions and interest thereon with respect to Gaetano and Miller. West Geauga subsequently contacted Hawken regarding the demand for payment made by STRB. Thereafter, STRB, West Geauga, and Hawken exchanged a series of correspondence in which STRB maintained that Gaetano and Miller were teachers for purposes of R.C. Chapter 3307, while both educational entities argued that no employer or employee contributions were required to be made on behalf of the two teachers.

The parties were unable to resolve the dispute. As a result, STRB filed a complaint in the trial court on August 3, 1995. The complaint named West Geauga, Gaetano, and Miller as co-defendants. In the action, STRB requested a declaratory judgment pursuant to R.C. 2721.01 *et seq.* and Civ.R. 57 in which the trial court would declare that West Geauga was bound by R.C. Chapter 3307 to make employer and employee contributions to STRS on behalf of its auxiliary services teachers, including Gaetano and Miller.

Also, STRB asked the trial court to issue a writ of mandamus under R.C. 2731.01 *et seq.* ordering West Geauga to pay the total amount of contributions plus interest that should have been paid to STRS on behalf of Gaetano and Miller for their service as public school teachers from the 1981 through 1988 school years. The complaint did not include any specific prayer for relief directed against Gaetano and Miller.

Gaetano and Miller filed a joint answer to the complaint, while West Geauga filed its own separate answer. In their answer, Gaetano and Miller prayed that the trial court enter judgment in favor of STRB. The teachers also cross-claimed against their co-defendant, West Geauga, by requesting that the trial court issue

a writ of mandamus and a declaratory judgment ordering West Geauga to pay both the employer and employee contributions to STRS for the years in question.

On November 21, 1995, Hawken filed a motion to intervene in the litigation pursuant to Civ.R. 24. The basis for requesting leave to intervene was that West Geauga had notified Hawken that should STRB prevail in its action against West Geauga, the amount of any such recovery would be fully deducted from R.C. 3317.024(P) auxiliary services funds that would otherwise be payable to Hawken. In fact, Hawken further alleged in its motion that West Geauga had already begun to withhold such funds in the expectation that STRB would ultimately recover against West Geauga. The trial court granted Hawken's request to intervene in the action.

Once Hawken was granted leave to intervene as a party-defendant, it filed an answer to STRB's complaint and cross-claims against West Geauga, Gaetano, and Miller. As to Gaetano and Miller, Hawken asked for a declaratory judgment that the teachers should be held responsible for paying any employee contributions to STRS. In its cross-claim against West Geauga, Hawken prayed for both injunctive relief and a declaratory judgment by which the trial court would order West Geauga to release the auxiliary services funds currently being withheld from Hawken.

The parties elected to submit the matter to the trial court for consideration based upon the pleadings, the evidence, and the briefs of the parties' respective counsel. The evidence consisted of a set of stipulated facts and attached exhibits.

On May 1, 1997, the trial court entered judgment in the matter. The trial court found in favor of the co-defendants on the original complaint filed by STRB; in favor of West Geauga on the cross-claims of Gaetano and Miller; and in favor of Hawken on its cross-claim against West Geauga for the release of the auxiliary services funds being withheld from Hawken.

The trial court's decision was predicated on its conclusion that Gaetano and Miller were not teachers as defined by R.C. 3307.01(B) and, therefore, were not members of STRS. In expressing its rationale, the trial court made the observation that "Hawken, a nonsectarian, nonpublic high school, lawfully hired Gaetano and Miller to provide 'auxiliary services' to Hawken students using West Geauga as a conduit for state funds allocated to Hawken."

From this judgment, STRB filed a timely notice of appeal with this court. One day later, Gaetano and Miller filed a separate notice of appeal from the trial court's decision. On December 12, 1997, this court issued a judgment entry consolidating the two appeals for purposes of briefing, oral argument, and disposition. The entry further ordered that STRB, Gaetano, and Miller would

proceed as appellants, while West Geauga and Hawken would be classified as appellees.

On appeal, STRB asserts the following assignments of error:

"[1.] The trial court erred to the prejudice of Plaintiff–Appellant in holding that Gaetano and Miller were not, and were not legally required to be, teachers for whom the school district was required to make retirement contributions and report service credit to STRS.

"[2.] The trial court erred to the prejudice of Plaintiff–Appellant in holding that West Geauga was not obligated to make employer and employee retirement contributions, and to otherwise timely comply with the requirements of R.C. Chapter 3307 with respect to auxiliary services teachers who worked in private schools within the district.

"[3.] The trial court erred to the prejudice of Plaintiff–Appellant in holding that STRS was not entitled to a writ of mandamus and declaratory judgment ordering West Geauga to make employer and employee contributions plus interest on behalf of Gaetano and Miller for the periods in issue."

In their brief, Gaetano and Miller put forth the following assignments of error:

"[1.] The trial court erred by determining that Gaetano and Miller were not 'teachers' as defined by Ohio Revised Code [Section] 3307.01(B).

"[2.] The trial court erred by not considering the fact that state-provided auxiliary service funds were used to pay Gaetano and Miller and such funds could not have been used for such purpose unless Gaetano and Miller were employed by West Geauga.

"[3.] The trial court erred by not considering West Geauga's treatment of teachers in situations similar to [those of] Gaetano and Miller.

"[4.] The trial court erred by not taking into consideration STRB's decision that Gaetano and Miller were entitled to STRS benefits during the years they were paid by West Geauga and working at Hawken.

"[5.] The trial court erred by not ordering West Geauga to pay both the employer and employee contributions as the result of its wilful failure to perform its statutory duties.

"[6.] The trial court erred by not ordering Hawken and/or West Geauga to pay Gaetano and Miller's attorney fees."

After reviewing all of appellants' proposed errors, it is apparent that the crux of their position is that the trial court erred in its decision that Gaetano and Miller were not employed by West Geauga, but rather by Hawken. This determination by the trial court ultimately required the conclusion that Gaetano

and Miller were not eligible for membership in STRS. The collective assignments presented by appellants attempt to refute this conclusion drawn by the trial court. In doing so, however, they overlap in terms of legal reasoning and argumentation.

Therefore, rather than addressing each assignment individually, we will instead discuss the following three questions that will analyze and dispose of all the issues raised under the various assignments submitted by appellants: (1) Whether a public school district's use of R.C. 3317.024(P) auxiliary services funds to provide remedial services to nonpublic school students can only be carried out through public school employees? (2) Whether Gaetano and Miller were teachers as defined by R.C. 3307.01(B)? and (3) Whether the decision of STRB that Gaetano and Miller were entitled to participate in STRS is subject to judicial review?

■ The first question before this court has to do with the expenditure of R.C. 3317.024(P) auxiliary services funds by a public school district. Pursuant to R.C. 3317.024, the state appropriates money in the form of auxiliary services funds to public school districts. Division (P) of the statute authorizes an amount to each school district "for the implementation of section 3317.06 of the Revised Code."

During the 1980s, R.C. 3317.06 provided in part:

"Moneys paid to school districts under division (P) of section 3317.024 of the Revised Code shall be used for the following independent and fully severable purposes:

" * * *

"(G) To provide remedial services to pupils attending nonpublic schools within the district. Such services shall be provided in the public school, in nonpublic schools that have no religious or sectarian affiliation, in public centers, or in mobile units located off of the nonpublic premises as determined by the department of education. If such services are provided in the public school or in public centers, transportation to and from such facilities shall be provided by the school district in which the nonpublic school is located." [2]

In the case *sub judice,* it is uncontroverted that the payments made to Gaetano and Miller by West Geauga constituted proper expenditures of funds provided to the public school district pursuant to R.C. 3317.024(P). Furthermore, it is also undisputed that the expenditures were made in order to provide remedial services to pupils at Hawken as authorized by R.C. 3317.06(G).

---

2. R.C. 3317.06(G) has since been amended.

According to appellants, teachers who provide remedial services under R.C. 3317.06(G) and who are paid from auxiliary services funds are required to be in the employment of the public school district. Appellees, however, contend that there is no such requirement.

At the outset, we would note that there is no statutory language to support the position taken by appellants. Neither R.C. 3317.024(P) nor 3317.06(G) contains any language stating that the remedial assistance offered to nonpublic school students must be provided by employees of the public school district to which the auxiliary services funds were originally allocated. These statutes merely grant a blanket authorization to provide certain *services* to nonpublic school students. Thus, there does not appear to be any statutory requirement that Gaetano and Miller had to have been employed by West Geauga, as opposed to Hawken.

Recognizing this, appellants primarily advance a constitutional argument to support their position. In doing so, they rely heavily on the decision of the United States Supreme Court in *Wolman v. Walter* (1977), 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714.

In *Wolman,* the court considered the constitutionality of the 1976 version of R.C. 3317.06 authorizing various forms of aid to nonpublic schools, including sectarian institutions. The court held that those portions of R.C. 3317.06 authorizing the state to provide nonpublic school pupils with books, standardized testing and scoring, diagnostic services, and therapeutic and remedial services were constitutional. However, those sections relating to instructional materials and equipment and field trip services were deemed unconstitutional.

In the version of R.C. 3317.06 that existed in 1976, the section relating to the provision of remedial services was division (I). It read in part:

"To provide remedial services to pupils attending nonpublic schools within the district. Such services shall be provided in the public school, in public centers, or in mobile units located off of the nonpublic premises as determined by the state department of education."

When discussing the expenditure of public funds for therapeutic, guidance, and remedial services, the court observed that "[p]ersonnel providing the services must be employees of the local board of education or under contract with the State Department of Health." *Wolman* at 244–245, 97 S.Ct. at 2604, 53 L.Ed.2d at 730–731. Appellants make much of this statement to support their stance that Gaetano and Miller were required as a matter of constitutional law to be employees of West Geauga.

Two observations about this statement are in order. First, when read in its proper context, the court's statement was hardly a constitutional mandate that only employees of the public school district can render services under R.C.

3317.06. Rather, it appears that the court was simply restating a stipulation of fact submitted by the parties in *Wolman* that all of the personnel providing such services would, in fact, be employees of the public board of education or the state department of health.

Second, it must be remembered that the court in *Wolman* was faced with a possible violation of the Establishment Clause in the 1976 version of the statute.[3] After *Wolman* was rendered, the General Assembly amended the law such that the version of R.C. 3317.06(G) in effect during the 1980s included a provision that also authorized the provision of remedial services "in nonpublic schools that have no religious or sectarian affiliation."

Thus, the question of whether an R.C. 3317.06(G) service provider could render remedial aid in a nonpublic, nonsectarian school was not before the court in *Wolman*. In this regard, we would simply note that if the institution in which the services were rendered was nonsectarian, there was no risk of an Establishment Clause violation. In the instant matter, it is uncontroverted that Hawken is nonsectarian. *Wolman* is therefore inapplicable.

Thus, in response to the first query posed by this appeal, we can discern no statutory or constitutional requirement that a public school district's use of auxiliary services funds to provide remedial services to nonpublic school students pursuant to R.C. 3317.06(G) must always be carried out by employees of the public school district. As a result, we see no basis for concluding that Gaetano and Miller were employed by West Geauga simply because Hawken used auxiliary services funds available under R.C. 3317.06(G) to pay the teachers.

■ The second question we must address is not whether Gaetano and Miller were teachers, but whether they were teachers as defined by R.C. 3307.01(B). R.C. Chapter 3307 provides detailed provisions governing the administration of STRS. Under this system, it is readily apparent that the term "teacher" must be defined in order to determine exactly who qualifies for membership in STRS. R.C. 3307.01 contains the applicable definition that governs membership in the retirement system.[4] At the time STRB filed its complaint in the trial court, the statute provided:

"(B) 'Teacher' means any person paid from public funds and employed in the public schools of the state under any type of contract described in section 3319.08

---

3. The Establishment Clause provides that "Congress shall make no law respecting an establishment of religion." It has been incorporated against the states through the Fourteenth Amendment.

4. Although there are other methods of qualification, this is the section applicable to the facts of the instant case.

of the Revised Code in a position for which the person is required to have a license issued pursuant to sections 3319.22 to 3319.31 of the Revised Code; and any other teacher or faculty member employed in any school, college, university, institution, or other agency wholly controlled and managed, and supported in whole or in part, by the state or any political subdivision thereof * * *."

Based on a plain reading of the statute, there are four requirements that must be satisfied before an individual can be considered a teacher for purposes of STRS eligibility: (1) the individual must be paid from public funds, (2) the individual must be employed in the public schools of the state, (3) the individual must be employed under any type of contract described in R.C. 3319.08, and (4) the individual must occupy a position for which a certificate is required under R.C. 3319.22 to 3319.31. Courts have held that all four conditions must be met for someone to qualify as a teacher under the statute. See, *e.g.*, *State Teachers Retirement Sys. Bd. v. Cuyahoga Falls Bd. of Edn.* (1985), 26 Ohio App.3d 45, 46, 26 OBR 218, 219–220, 498 N.E.2d 167, 169–170; *State ex rel. Yovich v. Cuyahoga Falls City School Dist. Bd. of Edn.* (June 23, 1992), Franklin App. No. 91AP–1325, unreported, at 4, 1992 WL 142263.

The application of these four criteria to the present case does not support the conclusion drawn by appellants that Gaetano and Miller were teachers for purposes of R.C. 3307.01(B). Gaetano and Miller were paid from public funds, thereby satisfying the first statutory criterion. The second and third requirements, however, are more problematic.

The primary explanation advanced by appellants in regard to the second criterion is that Gaetano and Miller had to be in the employment of West Geauga, a public school, because they were paid with auxiliary services funds allocated to the public school district under R.C. 3317.024(P). This argument mirrors appellants' contention that Gaetano and Miller were employees of West Geauga because it was either statutorily required by R.C. 3317.06(G) or constitutionally mandated by the United States Supreme Court in *Wolman*. We, however, rejected these arguments as previously discussed.

As a fall-back position, appellants maintain that the evidence nevertheless supported a finding of an employer-employee relationship between West Geauga and the teachers. From appellants' perspective, the fact that Hawken exerted day-to-day control over Gaetano and Miller should not be dispositive. Rather, they claim that an employment relationship existed because West Geauga retained the ultimate right to control the teachers.

Upon review, we can not agree with appellants' position in this regard. The stipulated facts submitted by the parties showed that Gaetano and Miller were hired by Hawken and that all of the remedial services performed by them were rendered exclusively at Hawken. The teachers never worked in any facility

owned or operated by West Geauga. Moreover, West Geauga did not exercise any supervision over the teachers' performance of their duties at Hawken. Based on these uncontroverted facts, it can hardly be said that West Geauga retained ultimate control over the actions of Gaetano and Miller.

The third criterion was also not satisfied. Gaetano and Miller were not employed "under any type of contract described in section 3319.08 of the Revised Code." R.C. 3319.08 provides:

"The board of education * * * shall enter into written contracts for the employment and reemployment of all teachers. * * * Such written contracts and supplemental written contracts shall set forth the teacher's duties and shall specify the salaries and compensation to be paid for regular teaching duties and additional teaching duties * * *."

As described earlier, the parties stipulated that between the 1981 and 1984 school years, Hawken submitted purchase orders to West Geauga indicating the number of hours worked by Gaetano and Miller. Hoffman, the associate headmaster of Hawken, signed the purchase orders that were then forwarded to West Geauga for payment from auxiliary services funds. From the 1985 through 1988 academic years, Hawken submitted notices of services rendered by the teachers on its school letterhead to West Geauga for payment. In light of these facts, there is no evidence that Gaetano and Miller ever entered into actual contracts with West Geauga as described by R.C. 3319.08.

The statute does provide that "[i]f a board adopts a motion or resolution to employ a teacher under a limited or continuing contract and the teacher accepts such employment, the failure of such parties to execute a written contract shall not void such employment contract." R.C. 3319.08. In the case at bar, the West Geauga Board of Education never adopted such a motion or resolution, thereby undercutting any notion that Gaetano and Miller were formally hired by West Geauga as teachers even in the absence of written contracts. See, e.g., Yovich at 4–6.

The evidence demonstrates that Gaetano and Miller were not employed by West Geauga under R.C. 3319.08 contracts and that the West Geauga Board of Education never formally adopted a motion or resolution employing the women as teachers. Therefore, we conclude that Gaetano and Miller were not "teachers" eligible for STRS membership as defined under R.C. 3307.01(B).

■ The third question that we must address is whether the decision of STRB that Gaetano and Miller were "teachers" for purposes of STRS is subject to judicial review. R.C. 3307.01(B) does state that "[i]n all cases of doubt, the state teachers retirement board shall determine whether any person is a teacher, and its decision shall be final."

Despite this language in the statute, all of the parties, including appellants, agree that a determination by STRB regarding a teacher's eligibility to participate in the retirement system must be honored unless there is an abuse of discretion by STRB in making its decision. We agree with this principle and conclude that STRB's decision as to whether someone is a teacher under R.C. 3307.01(B) is subject to review by the judiciary under an abuse of discretion standard. See, *e.g.*, *State ex rel. McMaster v. School Emp. Retirement Sys.* (1994), 69 Ohio St.3d 130, 133, 630 N.E.2d 701, 704–705 (wherein the Supreme Court of Ohio held that the decision of the School Employees Retirement Board regarding whether a person is entitled to disability retirement benefits is subject to judicial review).

As we have previously concluded, Gaetano and Miller were neither "employed in the public schools of the state" nor employed "under any type of contract described in section 3319.08 of the Revised Code." Thus, they were not teachers as defined by R.C. 3307.01(B), and the decision of STRB to the contrary constituted an abuse of its administrative discretion.

Applying our holdings to the instant matter, the first and second assignments of error proposed by STRB are without merit. Likewise, the first, second, third, and fourth assignments of error asserted by Gaetano and Miller are not well founded.

Given our conclusion that Gaetano and Miller were not teachers under R.C. 3307.01(B), the trial court did not err by refusing to issue a writ of mandamus and declaratory judgment ordering West Geauga to pay both the employer and employee contributions on behalf of Gaetano and Miller. As a result, STRB's third assignment and Gaetano and Miller's fifth assignment are not well taken.

Finally, the sixth assignment of Gaetano and Miller lacks merit. Since Gaetano and Miller were not entitled to a declaratory judgment, they could not recover attorney fees pursuant to R.C. 2721.09 or 2721.11.

Based on the foregoing analysis, appellants' assignments of error are not well taken. Accordingly, the judgment of the trial court is affirmed.

*Judgment affirmed.*

NADER, J., concurs.

FORD, P.J., concurs separately.

FORD, Presiding Judge, concurring.

I respectfully concur with the opinion of the majority in this matter, with respect to the issues it has addressed under the submitted assignments of error. However, it is this writer's position that there is another significant administra-

tive law question that is not analyzed by the majority, that was clearly articulated in appellee Hawken School's brief, which, in this writer's view, merits consideration by this court.

Specifically, appellee (Hawken School) raises the question of whether the filing of a legal action in a state court, in behalf of the State Teachers Retirement Board ("STRB"), requires formal board authorization, or whether this legal undertaking may be validly instituted, in an independent manner, by the decision of the STRB's administrative head acting in conjunction with the assigned Assistant Attorney General.

The STRB is charged with the duty to manage the State Teachers Retirement System ("STRS") and consists of nine members: the Superintendent of Public Instruction, the State Auditor, the Attorney General, five "teacher members," and a "retired teacher member." R.C. 3307.03 and 3307.05. The Attorney General also is the legal adviser of the STRB. R.C. 3307.13. Pursuant to R.C. 3307.03, the STRB *"may sue and be sued,* plead and be impleaded, contract and be contracted with, and do all things necessary to carry out such sections." (Emphasis added.) R.C. 3307.04 expressly permits the STRB to "authorize its administrative officers, or committees composed of board members, to act for the board [the STRB] in accord with such policies [adopted by the STRB] and *subject to subsequent approval by the board."* (Emphasis added.)

An administrative agency, such as the STRB, may only exercise those powers conferred upon it as expressly stated in the statutory provisions that vest such agency with its powers. *Time Warner AxS v. Pub. Util. Comm.* (1996), 75 Ohio St.3d 229, 234, 240–241, 661 N.E.2d 1097, 1101–1102, 1105–1107; *Hansen v. State Personnel Bd. of Rev.* (1977), 51 Ohio App.2d 7, 13, 5 O.O.3d 118, 122, 364 N.E.2d 1386, 1390–1391; *State ex rel. Funtash v. Indus. Comm.* (1951), 154 Ohio St. 497, 43 O.O. 431, 96 N.E.2d 593, paragraph one of the syllabus; *Browning–Ferris Industries of Ohio, Inc. v. Mahoning Cty. Bd. of Health* (1990), 69 Ohio App.3d 96, 100, 590 N.E.2d 61, 63–64. When interpreting the meaning of a statutory provision, R.C. 1.42 states, "Words and phrases shall be read in context and construed according to the rules of grammar and common usage. Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly." In addition, "[t]he first rule of statutory construction is that a statute which is clear is to be applied, not construed. * * * Our obligation is to apply the statute as written." *Vought Industries, Inc. v. Tracy* (1995), 72 Ohio St.3d 261, 265–266, 648 N.E.2d 1364, 1367. Thus, "the court has a duty to enforce a statute as written and not ' "to add to, enlarge, supply, expand, extend or improve the provisions of the statute to meet a situation not provided for" ' (quoting *State ex rel. Foster v. Evatt* [1944], 144 Ohio St. 65, 29 O.O. 4, 56 N.E.2d 265, paragraph eight of the

syllabus)." *State ex rel. Toledo Blade Co. v. Univ. of Toledo Found.* (1992), 65 Ohio St.3d 258, 265, 602 N.E.2d 1159, 1164.

After having reviewed the relevant statutory provisions and applicable case law, it is clear that only under R.C. 3307.04, if at all, one could argue that an entity may initiate a lawsuit on behalf of the STRB, for that section permits the STRB to delegate some of its authority to officers or committees. However, R.C. 3307.04 requires that officers or committees authorized to act for the STRB shall do so only with "subsequent approval by the board." In light of R.C. 1.42, *Vought Industries,* and *Univ. of Toledo Found.,* a court cannot enlarge the powers of the STRB or its agents. Thus, it is my firm conviction that only the STRB may initiate a formal lawsuit.

As a means of comparison, the Ohio Revised Code expressly empowers the State Fire Marshal ("Fire Marshal") to initiate lawsuits, in behalf of the Department of Commerce, for whom he serves. R.C. 3737.46, 3737.21, and 3737.22. More importantly, unlike R.C. 3307.04, the fire marshal possesses the authority to initiate any lawsuit necessary to enforce the state fire code without any approval by the Department of Commerce. See R.C. 3737.46 and 3737.22. My position is best illustrated by the language contained in R.C. 3737.46, which states:

"Upon the request of the fire marshal, * * * the attorney general, the legal officer of any county or municipal corporation, or the law director of a township * * * shall bring an action for an injunction, temporary or permanent, or any other appropriate proceedings against any person violating or threatening to violate any provision of the state fire code or any order issued pursuant thereto in the court of common pleas in the county where the violation is occurring or threatened to occur."

This passage vests the Fire Marshal with broad powers to initiate a lawsuit against any individual who has violated or threatens to violate the state fire code. Importantly, the Fire Marshal may initiate such suit without the prior approval of any other entity. It is obvious that no such parallel language is found in R.C. 3307.04, or for that matter, in any other statutory section in R.C. Chapter 3307. This writer is mindful that other similar administrative statutory references could be made to support this position.

Therefore, it is my belief that only the STRB, acting in accord with its mandated statutory procedures, could initiate any legal action in this matter.